FILED
United States Court of Appeals
Tenth Circuit

July 7, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

LARRY D. HYSTEN,

      Plaintiff - Appellee,

v.

BURLINGTON NORTHERN SANTA
FE RAILWAY COMPANY,

      Defendant - Appellant.

No. 05-3391

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 01-CV-2296-KHV)**

David R. Cooper (Teresa L. Sittenauer with him on the briefs), Fisher, Patterson, Sayler & Smith, Topeka, Kansas, for the Defendant - Appellant.

Alan V. Johnson (Stephen D. Lanterman with him on the brief), Sloan, Eisenbarth, Glassman, McEntire & Jarboe, Topeka, Kansas, for the Plaintiff - Appellee.

Before **HENRY**, Chief Judge, **ANDERSON**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

This appeal challenges the final judgment in favor of the plaintiff Larry

Hysten on his retaliatory discharge claim under Kansas law. During trial, the

district court denied the motions of Mr. Hysten's employer, the defendant Burlington Northern Santa Fe Railway Company ("Burlington Northern"), for judgment as a matter of law.  The jury found that Burlington Northern retaliated against Mr. Hysten for reporting a work-related injury that might have led to a future claim under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. §§ 51-60.[1]  The jury awarded Mr. Hysten $30,000 in lost wages and benefits ("backpay"), $5,000 in compensatory damages, and $120,000 in punitive damages.  The district court subsequently denied Burlington Northern's post-verdict motion for judgment as a matter of law.  It also granted Mr. Hysten's motion to alter or amend the judgment to include prejudgment interest.

We have jurisdiction under 28 U.S.C. § 1291.  Exercising this jurisdiction, we hold that Burlington Northern's challenges to the jury verdict and to the award of prejudgment interest lack merit.  We therefore **AFFIRM** the district court's denial of Burlington Northern's post-verdict motion for judgment as a matter of law and the district court's post-verdict award of prejudgment interest.

---

[1]    FELA prescribes a scheme of liability for the railroad industry; it imposes liability on railroad carriers when an employee's injury results "in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51 (2007); *see Norfolk S. Ry. Co. v. Sorrell*, 127 S. Ct. 799, 805 (2007).

# I. BACKGROUND[2]

Mr. Hysten began working as a freight car mechanic for Burlington Northern in 1977 at its Topeka, Kansas facility. At the Topeka facility, front line supervisors report to foremen, who in turn report to the superintendent. In the late 1990's, Monte Johnson was Mr. Hysten's superintendent, James Hall was his foreman, and Dan Kennedy was his front line supervisor.

## A.    1998 Injury

In April 1998, Mr. Hysten injured his back. Because he was uncertain as to the cause of the injury, when asked whether he was reporting an on-duty injury, Mr. Hysten responded, "I don't know yet." App. at 1654. Mr. Hysten informed Mr. Johnson that he was investigating the cause of the injury through his medical providers. Although Mr. Johnson believed that Mr. Hysten had violated Burlington Northern's reporting rules by not identifying with immediacy the cause of his injury, no disciplinary action was taken against Mr. Hysten.

## B.    1999 Injury

On April 6, 1999, Mr. Hysten spent his work day repairing a rail car. The following morning, Mr. Hysten awoke with pain in his back and did not go to

---

[2]    Burlington Northern challenges the sufficiency of the evidence to support the jury's verdict on the retaliatory discharge claim, the jury's award of punitive damages, and the district court's award of prejudgment interest. We therefore present the factual underpinnings of these awards in the light most favorable to Mr. Hysten, the prevailing party.

work.  Still in pain on April 8, 1999, he went to the emergency room for medical treatment after calling in sick to work.  The emergency room physician diagnosed him with a muscle strain.

On Friday, April 9, 1999, Mr. Hysten left a voice message with Mr. Kennedy stating he had pulled a muscle in his back, and that he would return to work on the next business day.  On Monday, April 12, 1999, Mr. Hysten went to work and spoke with Pam Morse, an administrative clerk.  Mr. Hysten informed Ms. Morse that he did not know the cause of his injury.  Mr. Hysten filled out a medical-status form and submitted a note showing that he had received chiropractic care.  On the medical-status form, Mr. Hysten checked neither the "On-Duty injury" box nor the "Off-Duty medical problems" box; instead, with the approval of Ms. Morse, he wrote that he suffered a back injury of "unknown" cause.  App. at 1059, 1511.  Mr. Hysten subsequently relayed this information to Mr. Kennedy.

On April 15, 1999, Mr. Hysten completed a leave-of-absence form.  The form allows the employee seeking medical leave to indicate whether the reason for the requested absence is due to an off-duty injury, an on-duty injury, or some other cause.  Mr. Hysten wrote "unknown-back" on the blank line next to the box marked "other."  App. at 1062, 1506.  Mr. Johnson approved Mr. Hysten's request for medical leave; the authorized period expired on April 21, 1999.

Mr. Hysten filled out a second medical-status form on April 21, 1999.  This

time, Mr. Hysten averred that he suffered an *off-duty* injury. Notwithstanding, on April 26, 1999, Mr. Hysten completed a second leave-of-absence form on which he wrote "back unknown other" on the blank line accompanying the box denominated "other." App. at 1510. Again, Mr. Johnson approved Mr. Hysten's request, placing Mr. Hysten on a medical leave of absence until May 2, 1999.

Mr. Hysten returned to work in early May 1999, after Mr. Johnson approved his return to light-duty work in accordance with Burlington Northern's transitional work program. Under this program, Mr. Hysten was allowed to perform light-duty work for two weeks, and then was required to either perform his regular duties or apply for medical leave. The transitional work program was designed to ease the passage to full-time work for employees who had suffered off-duty or unknown injuries. On May 14, 1999, Mr. Hysten filled out a third medical-status form, again identifying the cause of his injury as "unknown." App. at 1078, 1511.

### C.      May 17, 1999 Meeting

On May 17, 1999, Mr. Hysten was summoned to meet with Mr. Johnson and Mr. Hall. Mr. Johnson expressly inquired whether Mr. Hysten's injury occurred on-duty or off-duty. Mr. Hysten responded that he did not know the origin, but that he was searching for a "doctor who would give [a] MRI so [he] would know what was going on here." App. at 1083.

Mr. Hall took notes during the meeting which he later incorporated into a follow-up e-mail to Mr. Johnson. This e-mail, dated May 17, 1999, recorded Mr.

Hysten's uncertainty as to the etiology of his injury. In particular, it stated that Mr. Hysten "wouldn't admit to what caused his latest back pain but 'thinks' it might have been caused by working under a freight car." App. at 1564. The e-mail also confirmed that Mr. Hysten was attempting to "get a medical professional to place the cause." *Id.*

### D. May 21, 1999 Meeting

On May 21, 1999, Mr. Hysten was asked to attend another meeting with Mr. Johnson. Mr. Hysten testified that Mr. Johnson told him that Burlington Northern needed to know the origin of the injury "or else." App. at 1108. Although Mr. Johnson did not define what he meant by "or else," Mr. Hysten interpreted the statement as an ultimatum: that is, he would be placed on medical leave or fired if he failed to describe the origin of the injury during this meeting. In response to Mr. Johnson's ultimatum, Mr. Hysten asked for his union representative, who was unavailable. Mr. Hysten then decided to claim the injury as "work-related," in part because he felt as if he "was being pushed in the corner." App. at 1109. According to the testimony of Burlington Northern's claims manager, the on-duty injury report triggered Mr. Hysten's FELA rights. The report placed Burlington Northern on notice that he could file a FELA lawsuit within the applicable three-year limitation period.[3] *See* 45 U.S.C. § 56 (1999).

---

[3] Subsequently, on June 2, 1999, Mr. Hysten submitted another
(continued...)

Within moments after Mr. Hysten characterized the injury as work-related, Mr. Johnson stated that Burlington Northern was going to "[s]et up an investigation." App. at 1110. Mr. Hysten was taken to a conference room and was told to fill out a form entitled "Employee Personal Injury/Occupational Illness Report." *Id.* at 1110-11, 1503. Mr. Hysten described his injury as lower back pain, identified April 6, 1999 as the date of the injury, placed a question mark next to the query of when he first noticed symptoms, and stated that the injury occurred at work while he was placing an air hose or a new test device on a railcar.

Soon after Mr. Hysten completed the personal-injury report, Mr. Johnson entered the conference room and gave Mr. Hysten a written notice of a disciplinary investigation. Mr. Johnson understood that a railroad company employee who has an on-the-job injury has a possible FELA claim against the railroad company for damages. The written notice informed Mr. Hysten that he was being investigated for possible violations of work-related rules as stated in Burlington Northern's safety management handbook. The written notice identified the following work-related rules: Rule S-28.2.5(A) and (C); Rule S-28.2.7; and Rule S-28.13.

### E.     Applicable Reporting Rules and Disciplinary Policy

Rule S-28.2.5 memorializes Burlington Northern's policy regarding the reporting of injuries and provides, in pertinent part:

---

[3](...continued)
 medical-status form stating again that the injury was sustained on duty.

### A.     Injuries to Employees

All cases of personal injury, while on duty or on company property, *must be immediately reported* to the proper manager and the prescribed form completed.

If after the initial report of an injury, employees seek medical attention for a work-related injury, they must contact the appropriate supervisor and update their status.

A personal injury that occurs while off duty that will in any way affect employee performance of duties must be reported to the proper manager *as soon as possible*.  The injured employee must also complete the prescribed written form before returning to service.

. . . .

### C.     Employees with Information Concerning Injuries

Employees with information concerning an accident or injury to themselves, another employee, or a non-employee must *immediately report* the information to the proper manager and complete the prescribed form.

App. at 1513 (emphasis added).

Rule S-28.2.7 sets out Burlington Northern's policy as to furnishing information.  It prohibits employees from "withhold[ing] information, or [from] fail[ing] to give all the facts to those authorized to receive information regarding unusual events, accidents, personal injuries, or rule violations."  App. at 1514. Finally, Rule S-28.13 sets forth the duties of employees vis-a-vis their supervisors.  It requires employees to "report to and comply with instructions from supervisors who have proper jurisdiction."  App. at 1515.

As reflected in its Employee Performance Accountability Policy (the "Disciplinary Policy"), Burlington Northern employs a system of progressive discipline. The Disciplinary Policy is divided into three parts: Part I, "Standard Handling," addresses offenses that are not considered aggravated violations of company rules; Part II, "Serious Offenses," identifies offenses that warrant disciplinary action but which, by themselves, are not sufficient to warrant dismissal; and Part III, "Offenses Warranting Dismissal," addresses single offenses that may be so egregious as to warrant dismissal. App. at 1659-62. Although infractions of reporting rules—like those with which Burlington Northern charged Mr. Hysten—are not expressly identified as violations of the Disciplinary Policy, it generally describes, by way of illustration, certain kinds of employee misconduct and places classes of that misconduct under the appropriate Parts.

### F.    Investigative Hearing

After Burlington Northern notified Mr. Hysten that an investigative hearing would be held, it was rescheduled twice before proceeding on the morning of Monday, June 14, 1999. Mr. Hysten did not attend apparently due to ingestion of a physician-prescribed muscle relaxant which caused him to forget about the hearing. Mr. Johnson conducted the investigative hearing despite Mr. Hysten's absence.

On Tuesday, June 15, 1999, Mr. Hysten called Mr. Johnson, and, in a voice

-9-

message, requested that the hearing be rescheduled. On June 16, 1999, Mr. Johnson indicated that Burlington Northern would not reschedule the hearing. During this time, Mr. Hysten continued to work at his regular job.

On July 12, 1999, Mr. Johnson gave Mr. Hysten a letter that stated, in relevant part:

> This is to advise you that as a result of Formal Investigation concerning your alleged on duty injury, March 1999, while assigned as Carman at the Topeka System Maintenance Terminal, held on June 14, 1999 you are hereby dismissed from service effective immediately for violation of Rules S-28.2.5 Reporting, Paragraphs A and C, Rule S-28.2.7 Furnishing Information, and S-28.13 Reporting and Complying with Instructions of the Mechanical/P&M Safety Rules Policies, January 1999.

App. at 1569.

At trial, Mr. Johnson testified that the factual predicate for these violations fell within Part III, the "Offenses Warranting Dismissal" section, of Burlington Northern's Disciplinary Policy.[4] In particular, Mr. Johnson testified that Mr. Hysten's behavior constituted either "[g]ross dishonesty in communicating with officials of the company about any job related subject" or acting "with intent to defraud the carrier of monies or property not due, to include falsification or misrepresentation of an on-duty injury." App. at 1871. Both types of behavior

---

[4] The jury did not hear live testimony from Mr. Johnson. Instead, pursuant to Fed. R. Civ. P. 32(a)(3), Mr. Johnson's videotaped deposition testimony was presented to the jury.

are listed as terminable offenses.

### G. Appeal of Termination

In April 2000, Mr. Hysten's union appealed Burlington Northern's termination decision in accordance with the collective bargaining agreement and the Railroad Labor Act ("RLA"), 45 U.S.C.A. §§ 151-188. The Public Law Board ("Board") concluded that there was insufficient evidence that Mr. Hysten sustained his injury on duty. The Board also concluded that Mr. Hysten waited too long—forty-six days—to report the injury as "on-duty," in violation of Rules S-28.2.5, S-28.2.7, and S-28.13. However, in the interest of giving a long-term employee "one final chance," the Board reinstated him. App. at 1642. It did not award back pay, but left his seniority intact.

### H. Federal Litigation

On April 3, 2001, Mr. Hysten returned to work for the first time since his discharge on July 12, 1999. On May 25, 2001, Mr. Hysten filed a state law retaliatory discharge claim against Burlington Northern in state court.[5] After

---

[5] Mr. Hysten actually sought judicial relief for his discharge in January 2000. He filed a 42 U.S.C. § 1981 retaliation action, in the United States District Court for the District of Kansas, asserting that Burlington Northern discharged him for filing a § 1981 race discrimination claim approximately one year prior to his 1999 back injury. In connection with that litigation, Mr. Hysten initially brought a Kansas state-law claim for retaliatory discharge. *See Hysten v. Burlington N. & Santa Fe R.R. Co.*, No. 00-2002-GTV, 2000 WL 1871889 (D. Kan. Dec. 6, 2000) (unpublished). The district court granted summary judgment in favor of Burlington Northern on the § 1981 claim and declined to exercise

(continued...)

Burlington Northern removed the case, the federal district court, on March 26, 2002, granted Burlington Northern's Rule 12(b)(6) motion to dismiss predicting that the Kansas courts would not agree that "public policy . . . requires that the exceptions to the doctrine of employment at will be extended to create an actionable retaliation claim under FELA." *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 196 F. Supp. 2d 1162, 1170 (D. Kan. 2002).

On appeal, we certified two questions to the Kansas Supreme Court. *See Hysten v. Burlington N. Santa Fe R.R. Co.*, No. 02-3148, 2004 WL 966286, at *3 (10th Cir. May 6, 2004) (unpublished). In response, the Kansas Supreme Court held that: (1) Kansas recognizes a common law tort of retaliatory discharge for the exercise of rights under FELA; and (2) the remedies available to aggrieved employees under the RLA are not adequate alternative remedies. *See Hysten v. Burlington N. Santa Fe. Ry. Co.*, 85 P.3d 1183, 1189-91 (Kan.), *as modified by*, 108 P.3d 437, 444-45 (Kan. 2004). We consequently reversed the district court's order of dismissal and remanded for further proceedings. *See Hysten*, 2004 WL 966286, at *4.

---

[5](...continued) supplemental jurisdiction over the state-law retaliatory discharge claim. We affirmed. *See Hysten v. Burlington N. & Santa Fe Ry. Co.*, No. 01-3021, 2002 WL 1923821, at *6 (10th Cir. Aug. 21, 2002) (unpublished). Because this litigation does not bear directly on the issues before us, we refrain from further discussion of it.

On February 3, 2005, Burlington Northern moved for summary judgment. It argued that the RLA preempts Mr. Hysten's retaliatory discharge claim, that Mr. Hysten cannot show a prima facie case of retaliation, and that, even assuming the existence of a prima facie case of retaliation, he lacked evidence to show that Burlington Northern's legitimate, non-discriminatory reason was pretextual. Denying the motion, the district court reasoned that Mr. Hysten's evidence of a prima facie case of retaliation and of close temporal proximity between his on-duty injury report and Burlington Northern's adverse employment action was sufficient under Kansas law to raise a genuine issue of material fact as to pretext. *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 372 F. Supp. 2d 1246, 1257 (D. Kan. 2005).

At trial, Mr. Hysten sought lost wages, emotional distress damages, compensatory damages, and punitive damages. Burlington Northern moved for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a), at the close of Mr. Hysten's evidence and again at the close of all evidence. The district court denied both motions. Burlington Northern also objected to the punitive damages jury instruction, arguing that there was insufficient evidence to support it. The district court overruled the objection.

The jury found that Burlington Northern retaliated against Mr. Hysten for reporting a work-related injury for which Mr. Hysten could file a future claim for FELA benefits. The jury awarded $30,000 in backpay, $5,000 in compensatory

damages, and $120,000 in punitive damages.

Pursuant to Fed. R. Civ. P. 50(b), Burlington Northern filed a post-trial motion for judgment as a matter of law challenging the sufficiency of the evidence as to the retaliatory discharge claim and the punitive damages award. The district court denied the motion. The district court then granted, over Burlington Northern's objection, Mr. Hysten's motion to modify the verdict to include prejudgment interest, and awarded $9,265.09 in prejudgment interest. Burlington Northern timely appealed.

## II. DISCUSSION

Burlington Northern raises three challenges on appeal: (1) the district court erred in denying its motion for judgment as a matter of law on Mr. Hysten's retaliatory discharge claim because the only evidence of pretext was temporal proximity; (2) the district court erred in instructing the jury on punitive damages, and in sustaining the punitive damage award, because Mr. Hysten failed to introduce sufficient evidence to satisfy Kansas's standard for punitive damages; and (3) since the backpay award was unliquidated, the district court abused its discretion in awarding prejudgment interest. We reject each of Burlington Northern's challenges.

### A. Retaliatory Discharge Claim

Kansas recognizes three public policy exceptions to an otherwise rigid employment-at-will doctrine. *See Ortega v. IBP, Inc.*, 874 P.2d 1188, 1191 (Kan.

1994) ("doctrine of employment-at-will has been gradually eroded in Kansas and in other states").  An employer may be held liable for terminating an at-will employee who:  (1) reports serious infractions of public health, safety and welfare rules or regulations (i.e., whistle-blowing), *see Palmer v. Brown*, 752 P.2d 685, 689-90 (Kan. 1988); (2) files or intends to file a workers' compensation claim, *see Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility*, 101 P.3d 1170, 1173 (Kan. 2004); or (3) exercises his rights under FELA, *see Hysten*, 108 P.3d at 443-44.

Because the Kansas Supreme Court announced the FELA exception during the course of this litigation, *see Hysten*, 108 P.3d at 443-44, we, like the parties, presume that this exception applies when an employer terminates an employee who has reported an on-duty injury because of the possibility of FELA liability, even though a FELA lawsuit has yet to be filed.  *Cf. Gonzalez-Centeno*, 101 P.3d at 1173 ("workers compensation public policy exception has been extended to include *the possibility* that a workers compensation claim will be filed" (emphasis added)); *Chrisman v. Philips Indus., Inc.*, 751 P.2d 140, 142 (Kan. 1988) (extending tort of retaliatory discharge to situation where employee is terminated for intending to file workers' compensation claim).

Because evidence of retaliatory intent is frequently circumstantial in nature, s*ee Marinhagen v. Boster, Inc.*, 840 P.2d 534, 540 (Kan. Ct. App. 1992), Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing

-15-

retaliatory discharge claims.  *See Sanjuan v. IBP, Inc.* (*Sanjuan II*), 275 F.3d 1290, 1294 (10th Cir. 2002); *Gonzalez-Centeno*, 101 P.3d at 1177-78.

Under this framework, the plaintiff establishes a prima facie case by showing that:  (1) he filed a claim under FELA, or sustained an injury for which he might assert a future FELA claim; (2) the employer had knowledge of the plaintiff's FELA claim or of the fact that he sustained a work-related injury for which he might file a FELA claim; (3) the employer terminated the plaintiff's employment; and (4) a causal connection exists between the protected activity or injury and the termination.  *See Foster v. Alliedsignal Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002) (retaliatory discharge for filing workers' compensation claim); *Sanjuan v. IBP, Inc.* (*Sanjuan I*), 160 F.3d 1291, 1298 (10th Cir. 1998) (same).  "Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory" reason for the termination.  *See Foster*, 293 F.3d at 1193.  If the employer meets this burden, the plaintiff must show that he was terminated in retaliation for exercising, or for intending to exercise, his rights under FELA.  *Id.*; *see also Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir. 2001).

### 1.    Review of Denial of Burlington Northern's Rule 50(b) Motion

Burlington Northern moved for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), challenging the sufficiency of the evidence in support of the

retaliatory discharge claim. In denying the motion, the district court concluded that although the only evidence of pretext was temporal proximity, a showing of a prima facie case combined with close temporal proximity is sufficient to raise a genuine issue of material fact as to pretext (i.e., retaliatory intent) under Kansas law.

On appeal, Burlington Northern agrees with the district court's assessment of the nature of the evidence in support of Mr. Hysten's retaliatory discharge claim, but not the court's legal conclusion. Specifically, conceding that Mr. Hysten established a prima facie case, Burlington Northern agrees that his only evidence of retaliatory intent or pretext was the temporal proximity between the injury and the investigation/termination. But Burlington Northern argues that, as a matter of law, a prima facie case and temporal proximity are not sufficient to prove retaliatory intent or pretext in a retaliatory discharge case.

Mr. Hysten, on the other hand, challenges Burlington Northern's and the district court's characterization of his evidence. He contends that he introduced additional evidence which, along with the evidence of close temporal proximity, was legally sufficient to establish Burlington Northern's retaliatory intent.

We conclude that Mr. Hysten introduced sufficient evidence to support his retaliatory discharge claim. Unlike the district court, however, we believe this evidence consisted of more than mere temporal proximity. Thus, we affirm the district court's denial of Burlington Northern's Rule 50(b) motion, but apply a

different sufficiency-of-the-evidence theory.

### a. Rule 50 Standard

We review de novo the denial of a motion for judgment as a matter of law. *See Sanjuan I*, 160 F.3d at 1298.  A party is entitled to judgment as a matter of law "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."  *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000) (quoting *Finley v. United States*, 82 F.3d 966, 968 (10th Cir. 1996), *rev'd on other grounds*, 123 F.3d 1342 (10th Cir. 1997) (en banc)).  In reviewing the record, we "will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."  *Brown v. Gray*, 227 F.3d 1278, 1285 (10th Cir. 2000) (quoting *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000)).  Judgment as a matter of law is only appropriate if, after reviewing all of the evidence in the record, there is no legally sufficient evidentiary basis for a claim under the controlling law.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1099 (10th Cir. 2001).

In analyzing the sufficiency of the evidence post-trial, "the burden shifting framework of *McDonnell Douglas* is largely irrelevant."  *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000).  The dispositive question is whether there is legally sufficient evidence to support the jury's finding that Mr. Hysten

was terminated from his employment at least partly because he exercised, or was situated to exercise, his rights under FELA.  *See* Fed. R. Civ. P. 50(a)-(b); *see Sanjuan I*, 160 F.3d at 1298 (employees suing under Kansas common law need not show that retaliation was "employer's sole motive or reason" for termination).

A plaintiff can meet this burden through:  (1) evidence of a prima facie case of retaliatory discharge; (2) coupled with the presentation of "sufficient evidence to find that the employer's asserted justification is false" or other evidence that a retaliatory reason entered the decisional calculus.  *Reeves*, 530 U.S. at 148; *see also Stewart*, 217 F.3d at 1288.  The plaintiff must establish the claim by a "preponderance of the evidence," but the quality of the evidence itself must be "clear and convincing" in nature—it must be "certain, unambiguous, and plain to the understanding."  *Ortega*, 874 P.2d at 1198.

### b.    Application

Because we conclude that, in addition to evidence of temporal proximity, Mr. Hysten introduced other circumstantial evidence of pretext, we need not address whether a retaliatory discharge plaintiff may survive a judgment as a matter of Kansas law simply by establishing a prima facie case and showing close temporal proximity.

Drawing all reasonable inferences in favor of Mr. Hysten, we determine that the following pieces of circumstantial evidence (when viewed in the totality) permitted the jury to find, by a preponderance of the evidence, retaliatory intent:

-19-

(1) close temporal proximity; (2) Mr. Johnson's testimony concerning his knowledge of Mr. Hysten's potential claim and the termination process; (3) the performance-evaluation supervisory incentives to minimize employee reports of on-duty injuries; and (4) conceptual inconsistencies in Burlington Northern's stated legitimate, non-discriminatory reasons. We address each piece of evidence in sequence.

### i. Close Temporal Proximity

Mr. Hysten introduced strong evidence of temporal proximity. He testified that he received oral notice that he was being investigated for various rules infractions immediately after he reported to Mr. Johnson that his injury occurred on-duty. Within minutes of documenting this on-duty injury, Mr. Hysten received written notice of a formal investigation that, *inter alia*, charged him with lying about the origin of his injury. Mr. Johnson dismissed Mr. Hysten less than two months later. App. at 1876.

Under Kansas law, this evidence of close temporal proximity constitutes "highly persuasive evidence of retaliation." *Gertsch v. Cent. Electropolishing Co.*, 26 P.3d 87, 90 (Kan. Ct. App. 2001); *see also Foster*, 293 F.3d at 1196.

### ii. Knowledge of Potential Claim and Influence on Termination Decision

Mr. Hysten also introduced circumstantial evidence that Mr. Johnson, the

person who controlled each aspect of the termination process,[6] was not only aware

of, but also motivated to act by, Mr. Hysten's potential FELA claim.

Mr. Johnson testified that, throughout the termination process, he was

aware that a Burlington Northern employee with an on-duty injury has "a possible

claim against the railroad for damages under FELA." App. at 1876. Mr. Johnson

observed that an employee with an on-duty injury would normally "try to insert

[sic] a claim against the company for pain and suffering, moneys that they felt

might be due to them." *Id.* at 1871. And, although Mr. Johnson disclaimed

specific "knowledge of the FELA aspect" of Mr. Hysten's alleged on-duty injury,

Mr. Johnson acknowledged that the factual predicate for Mr. Hysten's discharge

was his assertion of an on-duty injury claim. *Id.* at 1899.

We acknowledge that this testimony is not an admission of liability. Nor is

it necessarily inconsistent with Burlington Northern's primary justification for

Mr. Hysten's termination—deterring and punishing the filing of spurious on-duty

---

[6]    The record is undisputed that Mr. Johnson exercised this level of control. Mr. Johnson initiated an investigation into the alleged reporting violations, and was responsible for presiding over the formal investigation. Although Mr. Hysten was given the opportunity to testify and present witnesses at the investigative hearing, Mr. Johnson retained sole discretion as to which witnesses would be called on Burlington Northern's behalf. When Mr. Hysten failed to appear at the hearing, Mr. Johnson denied Mr. Hysten's request to reopen the hearing, after apparently contacting the corporate office. Mr. Johnson then provided a recommendation to Burlington Northern's corporate office that Mr. Hysten was in violation of the cited reporting rules and should be dismissed. Finally, Mr. Johnson was responsible for drafting Mr. Hysten's dismissal letter.

injury reports which impose significant financial costs on the company. This testimony does indicate, however, that Mr. Johnson was quite conscious of Mr. Hysten's possible future claim for compensatory damages under FELA. In certain circumstances, such awareness can give rise to an inference of retaliatory intent.

In *Bausman*, for example, the plaintiff's employer claimed that it fired her for the "repeated failure to provide corroboration by a physician that her absences were a result of her work-related injury." *Bausman*, 252 F.3d at 1121. Applying Kansas law, we held that the plaintiff's prima facie evidence of causation—her employer's awareness that she "claimed" many of her absences were due to a work-related injury, along with its knowledge that she filed a workers' compensation claim—also permitted a jury to infer that the "employer acted with unlawful retaliatory intent, notwithstanding its asserted 'neutral' reason for the discharge." *Id*. at 1123.

The Kansas Supreme Court subsequently embraced the *Bausman* rationale, in *Gonzalez-Centeno*, reversing a grant of summary judgment in favor of the plaintiff's employer on a workers' compensation retaliatory discharge claim. 101 P.3d at 1179. The *Gonzalez-Centeno* court first clarified that "whether an employer's discharging an employee for failing to call in an anticipated absence that results from a work-related injury gives rise to liability is a question of fact." *Id.* at 1175. Then, quoting extensively from *Bausman*, it concluded that a reasonable jury could infer, in significant part from the employer's awareness that

the plaintiff's absences were due to his work-related injury, that the employer's alleged justification—the employee's refusal to follow certain notification procedures for anticipated absences (which were applied only to him)—was pretextual. *Id.* at 1178.

*Bausman* and *Gonzalez-Centeno* are instructive. They teach that evidence of an employer's awareness of an alleged on-duty injury, and knowledge that a legal claim has been or could be filed as a result can be persuasive evidence of pretext, at least when the factual basis for the adverse action produces a thin line between the alleged unlawful motivation for the action and the employer's proffered legitimate motivation. As reflected in these cases, such a thin line may exist when an employer purportedly discharges an employee for actions that the employee took or did not take in response to an on-duty injury—an injury that itself cannot form the basis for the discharge. For instance, unlawfully firing an employee for absences due to an on-duty injury may be recast as lawfully firing an employee for refusing to follow absence-notice procedures. *See Gonzalez-Centeno*, 101 P.3d at 1178. And an unlawful discharge of an employee for suffering an on-duty injury may, likewise, be re-framed as a lawful termination of an employee for failing to present medical corroboration of that on-duty injury. *See Bausman*, 252 F.3d at 1115, 1123.

The lesson of *Bausman* and *Gonzalez-Centeno* applies here where the alleged unlawful firing of an employee based upon the possibility of FELA

liability arising from his on-duty injury readily could be repackaged as the lawful

firing of an employee for falsely reporting that same on-duty injury. Consistent

with the logic of *Bausman* and *Gonzalez-Centeno*, on these facts the jury was

entitled to infer retaliatory intent from Mr. Johnson's knowledge that Mr. Hysten

suffered an injury, that Mr. Hysten ultimately reported his injury as occurring on-

duty, and that Mr. Hysten could bring a future legal claim under FELA against

Burlington Northern for that on-duty injury.

### iii. Injury-Free Incentive

Mr. Hysten also introduced evidence that Burlington Northern, however

indirectly, created a financial incentive for its supervisors, including Mr. Johnson,

to deter on-duty injury claims.

Mr. Johnson stated that his performance evaluation, the quality of which

dictated his annual salary, was based in part on the number of on-duty injuries per

man-hours worked. Thus, the lower the number of on-duty injuries, the better Mr.

Johnson's performance evaluation would be. With a better performance

evaluation there would be at least a significant possibility that Mr. Johnson would

see more pay. This calculus provides additional evidence of retaliatory intent;

Burlington Northern arguably created an incentive for Mr. Johnson to disfavor on-

duty injury claims.[7] *Cf. Trujillo v. Pacificorp*, 524 F.3d 1149, 1157 (10th Cir.

---

[7] Mr. Hysten also introduced evidence that Mr. Johnson was keenly
(continued...)

-24-

2007) (reviewing Americans with Disabilities Act ("ADA") associational-discrimination claim, and concluding that "a jury could reasonably infer," from evidence that the employer was "concern[ed] about rising healthcare costs," took "numerous efforts to cut those costs," was actively engaged in "monitoring of general healthcare costs," and specifically monitored healthcare costs associated with the child, that the employer terminated a terminally-ill child's parents because they were "too expensive").

To be sure, the performance-evaluation financial incentive is less suggestive of employer hostility toward the reporting of on-duty injuries than the other employer programs and practices we previously have found relevant to the issue of retaliatory intent under Kansas law. *See Bausman*, 252 F.3d at 1123 (job safety incentive program that potentially embarrassed injured employees by placing red stripe bearing the statement "I had an accident" on their hard hats for one year); *Sanjuan I*, 160 F.3d at 1296, 1297-98 (noting evidence of employer practice of "harassing and mistreating injured employees," of an accident-free incentive program in which groups of employees received prizes if no injuries were reported, and of the employer's "specific annual goal that is an average of

---

[7](...continued)
aware of his injury statistics. In a September 15, 1999 letter to one of Mr. Hysten's union representatives, Mr. Johnson stated that "100 plus carmen working in the car repair shop have worked in excess of 1.1 million man-hours without an injury and are to be commended for their efforts." App. at 1578, 1904.

cost of workers' compensation for all employees").[8]  It also seems logical for an

employer to assess a supervisor's performance, in part, based upon the safety

record of his crew.  However, we cannot ignore the possible implications of such

a system in evaluating the sufficiency of Mr. Hysten's evidence of retaliatory

intent.  *Cf. Trujillo*, 524 F.3d at 1157 (considering as relevant to pretext in the

ADA context an employer's general "concerns about rising healthcare costs" and

"numerous efforts to cut those costs").  An employer's consideration of workplace

injuries in evaluating its supervisors' performance—and, hence, salaries—carries

the potential for supervisors to pressure employees not to report work-place

injuries and to take retaliatory action against those who do.

### iv.    Explanatory Inconsistencies

Mr. Hysten also presented evidence of conceptual inconsistencies in

---

[8]       On remand from *Sanjuan I*, the district court used strong, condemnatory language in describing the practices of the employer, IBP, Inc.:

> At the time plaintiff was discharged, IBP had a bonus program in place which gave supervisors a bonus if they kept workers compensation costs below established levels. One could look at the program as paying management to fire injured employees. At the very least, such a program creates an atmosphere of aggression, harassment, and retaliation. There was evidence presented at the hearing that management harassed and yelled at injured employees. This type of hostile atmosphere would discourage injured workers from seeking medical attention and reporting their injuries.

*Sanjuan v. IBP, Inc.*, 78 F. Supp.2d 1195, 1197 (D. Kan. 1999).

Burlington Northern's stated reasons for the discharge.  *See Bausman*, 252 F.3d at 1120.  Drawing all inferences in favor of Mr. Hysten, a reasonable jury could seize upon these inconsistencies to find Burlington Northern's explanations to be false and to infer a retaliatory intent from their falsity.  *See Reeves*, 530 U.S. at 147; *Bausman*, 252 F.3d at 1120.

First, the testimony at trial casts doubt upon whether Mr. Hysten was fired for failing to report "immediately" *the origin* of his injury as on-duty in violation of Rule S-28.2.5.  App. at 1513.  Mr. Hysten's testimony indicates that he reported his injury, and what he knew about its origin, with a reasonable degree of immediacy.  Mr. Hysten testified that he did not feel the effect of his injury until the morning of April 7, 1999, when he awoke at home.  Two days later, on April 9, 1999, after unsuccessfully seeking emergency medical treatment, Mr. Hysten notified his front line supervisor that he pulled a back muscle.  Mr. Hysten further testified that, on April 12, 1999, the next business day, he went to work and filled out a medical-status form indicating that he suffered a back injury of "unknown cause."  App. at 1058.  Mr. Hysten did so after discussing his uncertainty concerning the cause of his injury with Ms. Morse, who "agreed with" Mr. Hysten that the "unknown cause" entry was appropriate.  *Id.* at 1059.  In each subsequent form and conversation predating the May 21, 1999 meeting (with the exception of the anomalous April 21, 1999 medical-status form) Mr. Hysten affirmatively described the genesis of his back injury as unknown.

-27-

Of course, it matters not what Mr. Hysten did, but what his supervisors actually believed. The testimony of Mr. Hysten's supervisors weakens Burlington Northern's stated Rule S-28.2.5 justification. Mr. Hall represented that it would not be a violation of any company policy if an employee did not know the origin of his injury and later reported his injury as occurring on-duty. Mr. Johnson also testified that he did not recall telling any other employee that he or she had to declare an injury of unknown origin as either on-duty or off-duty.

Mr. Johnson observed that Burlington Northern does "like to *try* to nail it down from a preventative standpoint, [to] find out what it is we need to do differently so it doesn't happen again." App. at 1877 (emphasis added). But he noted that to comply with Rule S-28.2.5, an employee who suffers an injury of possibly unknown origin must only tell Burlington Northern "that *something has happened.*" App. at 1882 (emphasis added).

Further undermining the Rule S-28.2.5 justification was the nature of Burlington Northern's leave-of-absence forms which Mr. Hysten completed on April 15, 1999 and April 26, 1999. Unlike the medical-status forms, the leave-of-absence forms permit an employee to check a box marked "other," rather than declare the injury to be "on-duty" or "off-duty." App. at 1506, 1510. The design of the form indicates Burlington Northern's general approval of reporting an injury of indeterminate etiology. Going further, it also suggests Burlington Northern's belief that reporting an injury of unknown origin in a timely

-28-

fashion—even when the exact origin can only be pinpointed later—satisfies an employee's obligations under Rule S-28.2.5. Additionally, Mr. Johnson authorized Mr. Hysten's requests for a leave of absence, despite Mr. Hysten's identification of the cause of his injury as "unknown." Therefore, the jury was entitled to conclude that Burlington Northern did not truly believe that Mr. Hysten waited too long to report where his injury occurred.

Second, the testimony at trial also challenged the legitimacy of Burlington Northern's "gross dishonesty" justification for the termination—i.e., that Mr. Hysten was fired for withholding or concealing information regarding the accident from his supervisors in violation of Rules S-28.13 and S-28.2.7. For instance, Mr. Hysten claims to have informed Mr. Kennedy that he suffered an injury of unknown origin when he completed his initial paperwork. Mr. Hall testified that he did not believe that Mr. Hysten was dishonest during the May 17, 1999 meeting, and Mr. Johnson conceded as much with respect both to the May 17, 1999 and the May 21, 1999 meetings.

In sum, a reasonable jury could find that Mr. Hysten was candid with all of his supervisors throughout the process. Indeed, it was this candor—stressing that he was attempting to ascertain the true cause of his injury—that, according to Mr. Hysten, ultimately led to Mr. Johnson's command that he declare the origin of the injury. Tellingly, Mr. Johnson later conceded that Mr. Hysten might not have engaged in grossly dishonest conduct. *See* App. at 1901 ("But is it gross

-29-

dishonesty?  I can't tell you that that's the way it was.").

Finally, Mr. Hysten presented evidence to discredit Burlington Northern's primary reason for the discharge—falsifying or misrepresenting an on-duty injury. For instance, Mr. Hysten testified that, despite informing Mr. Johnson that he was seeking medical advice as to the cause of the injury, Mr. Johnson issued an ultimatum during the May 21, 1999 meeting: report the origin of the injury now "or else."  App. at 1108-09.  This ultimatum, which implied termination for non-compliance, "intimidated" Mr. Hysten into identifying the origin of the injury. *Id*. at 1109, 1193.

A reasonable jury could infer that Mr. Johnson knew that Mr. Hysten did not falsify an on-duty injury because Mr. Johnson was the person who forced him into prematurely classifying the origin of his injury—without complete information—to preserve his FELA claim.   A reasonable jury could deduce that compelled decision-making, after full disclosure, does not involve the intent to deceive and that Mr. Johnson should have known that.  *See Bauman*, 252 F.3d at 1121 (noting that "Kansas law is that the employer is bound by what it knew or should have known" (internal quotation marks omitted)).  Indeed, when viewed in conjunction with the evidence discussed *supra* regarding Burlington Northern's injury-free incentives, a reasonable jury could infer that Mr. Johnson was pressuring Mr. Hysten not merely to identify the origin of the injury, but *to identify the origin of the injury as off-duty*.

True, evidence existed that supported Burlington Northern's claimed misrepresentation rationale—Mr. Hysten's second medical-status form, dated April 21, 1999, stated that the injury occurred "off-duty." App. at 1068-69, 1503. Nonetheless, the April 21, 1999 form did not preclude the jury from finding Burlington Northern's justification to be pretextual. Mr. Hysten testified that the April 21, 1999 characterization was a mistake and that he filled out each preceding and subsequent form in accordance with his belief that the injury was unknown. More importantly, Burlington Northern seemed to treat the April 21, 1999 form as a mistake, taking no action when Mr. Hysten subsequently reclassified his injury from off-duty to unknown.

Burlington Northern never accused Mr. Hysten of lying when he filled out his April 26, 1999 leave-of-absence form or his May 14, 1999 medical-status form, both of which identified the cause of his injury as unknown. Nor did Burlington Northern accuse Mr. Hysten of falsifying the origin of his injury after the May 17, 2001 meeting, when he again repeated to his supervisors that he was unsure of where it occurred. It was only after Mr. Hysten expressly identified the injury as on-duty that Burlington Northern invoked its misrepresentation rationale. Therefore, a reasonable jury could believe that Burlington Northern's disciplinary action was not based upon Mr. Hysten's deviation from his April 21, 1999 "off-duty" representation, but, rather, upon the *nature of the deviation*—the fact that Mr. Hysten deviated in a manner that could trigger FELA liability (i.e.,

-31-

to an on-duty injury).

### c.    Conclusion

Because Mr. Hysten introduced evidence of retaliatory intent in addition to evidence of close temporal proximity, and taking all reasonable inferences in favor of Mr. Hysten, we conclude that he introduced sufficient circumstantial evidence from which a reasonable jury could disbelieve Burlington Northern's "neutral" explanations.  Accordingly, a reasonable jury could infer that Mr. Hysten's discharge was motivated, in part, by retaliatory animus.  Therefore, we determine that the district court did not err in denying Burlington Northern's Rule 50(b) motion on this ground.

### B.    Punitive Damages

Over Burlington Northern's objection, the district court instructed the jury on punitive damages.  The jury awarded Mr. Hysten $120,000 in punitive damages.  Further, the district court denied Burlington Northern's post-trial Rule 50(b) challenge to the sufficiency of the evidence in support of the punitive-damages award.  It reasoned that there is a "thin line," if any, between evidence of intentional discrimination and the applicable standard for punitive damages—"malicious" or "willful" conduct—under Kansas law.  App. at 1008.

Relying upon Title VII jurisprudence, Burlington Northern contends that evidence of intentional retaliation, standing alone, is insufficient to support an award of punitive damages in a retaliatory discharge action.  Mr. Hysten responds

that success on a claim for discharging an employee with an unlawful, retaliatory motive is, by definition, sufficient to constitute willful or malicious conduct triggering punitive damages under Kansas law.

We review de novo the legal question of whether sufficient evidence exists to support a punitive damage award. *See EEOC v. Heartway Corp.*, 466 F.3d 1156, 1168 (10th Cir. 2006); *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir. 1995). After clarifying the appropriate standard under Kansas law, we affirm the district court's Rule 50(b) determination that Mr. Hysten introduced sufficient evidence to support the jury's award of punitive damages.[9]

## 1.    Standard

Under Kansas law, punitive damages are available when the plaintiff proves by clear and convincing evidence that "the defendant acted toward the plaintiff

---

[9]    Burlington Northern challenges both the denial of its Rule 50(b) motion and the district court's earlier decision to submit a punitive damages instruction to the jury. Both challenges trigger a similar analysis: whether the evidence was sufficient for a reasonable jury to award punitive damages. *Compare Reeves*, 530 U.S. at 150, *with Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1297-98 (10th Cir. 2001) (stating that party is entitled to jury instruction on theory of case so long as instruction is supported by competent evidence and holding that district court properly gave jury instruction on loss of enjoyment of life damages because "evidence supported an award of [such] damages" under state law). Thus, our holding that the district court properly denied Burlington Northern's Rule 50(b) challenge to the punitive damage award also defeats its argument that the evidence was insufficient to support a punitive damages jury instruction.

with willful conduct, wanton conduct, fraud or malice." KAN. STAT. ANN. § 60-3702(c) (2005). Here, consistent with the parties' requests, the court instructed the jury only regarding "malice" and "willful conduct." Punitive damages may be assessed against a corporate employer for the acts of an employee when the challenged conduct is authorized or ratified by the corporation or by a "person expressly empowered to do so on behalf of the . . . employer." *Id.* § 60-3702(d)(1); *see Lindsey v. Miami County Nat'l Bank*, 984 P.2d 719, 723 (Kan. 1999).[10]

The terms "malice" and "willful conduct" carry specific meanings. The term "malice" is defined as "a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse." Kansas Civil Pattern Jury Instructions § 103.05 (3d ed. 2005); *see also Werdann v. Mel Hambelton Ford, Inc.*, 79 P.3d 1081, 1090 (Kan. Ct. App. 2003). The phrase "willful conduct" means an "act performed with a designed purpose or intent on the part of a person to do wrong or to cause injury to another." Kansas Civil Pattern Jury

---

[10]    Burlington Northern does not contend on appeal, and did not contend before the district court, that the punitive-damages award must be vacated because Mr. Johnson's behavior cannot be attributed to Burlington Northern for purposes of assessing punitive damages. Thus, in our analysis *infra* we impute Mr. Johnson's behavior to Burlington Northern for purposes of assessing the sufficiency of the evidence in support of the punitive-damage award. *See Sanjuan II*, 275 F.3d at 1298 (holding that employer forfeited argument against punitive damage award—that it never ratified or authorized malicious conduct of supervisors in discharging employee—because it failed to cite precise reference in record where it raised argument before close of evidence).

Instructions § 103.04; *see also Heckard v. Martin*, 958 P.2d 665, 667 (Kan. Ct. App. 1998).

The terms "malice" and "willful conduct," as interpreted by Kansas courts, dictate that punitive damages may not be imposed automatically on an employer when a jury finds unlawful retaliation. *See Sanjuan I*, 160 F.3d at 1301. Instead, as relevant here, the employer need not know that it is violating an employee's legally protected rights, so long as the employer appreciates the wrongfulness, harmfulness, or injuriousness of the act itself. Thus, an employer acts maliciously or willfully when it discharges an employee with the intent to retaliate against him for filing, or being situated to file, a FELA claim, *only* when the employer is aware of the harmfulness, wrongfulness or injuriousness of its behavior.

Most often, this awareness is inferable from the intentional discrimination evidence supporting the underlying retaliatory discharge claim. *See Moyer v. Allen Freight Lines, Inc.*, 885 P.2d 391, 396 (Kan. Ct. App. 1994) (affirming punitive damages verdict and finding termination to be willful and malicious in large part from evidence of pretext); *see also Flenker v. Willamette Indus., Inc.*, 68 F. Supp. 2d 1261, 1269 (D. Kan. 1999) (genuine issues of material fact regarding pretext precluded summary judgment for employer concerning punitive damages, as the jury could "infer" from the pretext evidence malice or willfulness). For instance, an employer who intentionally discharges an employee

in violation of Kansas public policy frequently will do so without a reasonable justification, and with the goal of committing a harmful act. *See Moyer*, 885 P.2d at 209 ("In seeking punitive damages, Kay [Moyer] alleged Allen Freight's action in terminating her was wanton, willful, and malicious. Kay [Moyer] presented evidence that Allen Freight offered no explanation as to why she was being terminated.").

Similarly, when an employer terminates an employee in contravention of Kansas public policy and presents pretextual justifications to conceal this conduct, a jury could infer that the employer was acting with the purpose of doing something wrongful. Nor is it likely that an employer will be unaware of the injurious effect of an unjustified termination of an employee. Put simply, the intentional discharge of an employee for exercising, or planning to exercise, his legal rights often will include the intent to commit a wrongful, harmful, or injurious act. *See Morriss v. Coleman Co., Inc.*, 738 P.2d 841, 847 (Kan. 1987) ("the discharge of an employee in retaliation for filing a workers' compensation claim is actionable at law and may support an award of both actual and punitive damages.").

We disagree with Burlington Northern's suggestion that, if this is so, every verdict in favor of a plaintiff on a retaliatory discharge claim will necessarily include an award of punitive damages. Evidence of intentional discrimination does not per se satisfy Kansas's punitive damage standard. Situations will arise

(although perhaps not many) where the jury will find an employer to have intentionally retaliated against an employee but the employee-plaintiff, nonetheless, will be unable to establish that the employer operated with the requisite scienter to open the door to punitive damages.

For instance, as was the case in *Murphy v. City of Topeka-Shawnee County Dep't of Labor Servs.*, 630 P.2d 186 (Kan. App. Ct. 1981), the evidence may show that the employer reasonably believed that his retaliatory conduct was entirely lawful. In *Murphy*, the court first recognized the common law tort of retaliatory discharge for filing a claim under Kansas's Workmen's Compensation Act, but refused to permit the plaintiff to pursue punitive damages. *Id.* at 193. The *Murphy* court reasoned that the standard was not met because "[u]ntil the present pronouncement, it was not clearly known to defendants, or any other employer in this state, that a retaliatory discharge would give rise to an action for damages." *Id.*[11]

---

[11]     Somewhat similar to *Murphy*, the facts of this case prompted the Kansas Supreme Court to recognize a tort of retaliatory discharge for the exercise, or potential exercise, of FELA rights. *See Hysten*, 85 P.3d at 1191. However, Burlington Northern never argued before the district court that the novelty of the cause of action precluded an award of punitive damages under Kansas law. Nor has Burlington Northern articulated this argument on appeal. Thus, we need not resolve whether Mr. Hysten's punitive-damages award would survive the logic of *Murphy*. See, e.g., 10th Cir. R. 28.2(C)(2) ("For each issue raised on appeal, all briefs must cite the precise reference in the record where the issue was raised and ruled on."); *State Ins. Fund v. Ace Transp. Inc.*, 195 F.3d 561, 565 n.3 (10th Cir. 1999) (refusing to consider argument when appellant fails to show where in

(continued...)

Perhaps more importantly, Kansas law does not require a jury to impose punitive-damages liability on a defendant just because it has found that his conduct satisfies the legal requirements for such an award. *See Reeves v. Carlson*, 969 P.2d 252, 257 (Kan. 1998). Instead, at its discretion, the jury may award punitive damages, after weighing the facts against the purpose of such damages—*viz.*, to punish a defendant and to deter others from like conduct. *See* Kansas Civil Pattern Jury Instructions § 171.44 (3d ed. 2005).

Burlington Northern relies upon Title VII jurisprudence as reflecting the appropriate punitive damages standard under Kansas law. Its reliance is misplaced. Title VII's statutory scheme prescribes a more difficult-to-meet standard for punitive damages than does Kansas law.

The standard for punitive damages under Title VII, codified at 42 U.S.C. § 1981a(b)(1), limits the recovery of punitive damages to situations where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Id.* According to the Supreme Court, "[t]he terms 'malice' or 'reckless indifference' [in § 1981a(b)(1)] pertain to the employer's knowledge that it may be acting in violation of federal

---

[11](...continued)
record issue was raised and resolved); *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (issue not raised in opening brief is forfeited).

law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). Thus, the Title VII standard for punitive damages requires something more than the employer's mere awareness that its conduct constitutes intentional discrimination however egregious it might be. *Id.* at 537 (giving examples of "circumstances where intentional discrimination does not give rise to punitive damages liability"). It requires, at a minimum, evidence that the employer acted "in the face of a *perceived* risk that its actions [would] violate federal law." *Id.* at 536 (emphasis added); *see also Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007); *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1254 (10th Cir. 2005).

By contrast, neither KAN. STAT. ANN. § 60-3702 (2005) nor the case law interpreting it employ the heightened language of 42 U.S.C. § 1981a(b)(1). Instead, although the definitions of "malice" and "willful conduct" under Kansas law reach situations where an employer intentionally retaliates against an employee for reporting a workplace injury, the employer need not know that it is violating an employee's legally protected rights. The employer must just appreciate the wrongfulness, harmfulness, or injuriousness of its actions. Thus, because Kansas's punitive damages standard casts a broader net than 42 U.S.C. § 1981a(b)(1), Title VII jurisprudence ordinarily will offer no guidance in evaluating the sufficiency of the evidence in support of a punitive damages verdict under Kansas law.

In summary, Kansas law draws the distinction between intentional retaliation, which triggers compensatory damages, and "willful" or "malicious" conduct, which may result in punitive damages, at the employer's awareness of the wrongfulness, harmfulness, or injuriousness of his conduct. It is true that quite often a jury will be able to infer the scienter allowing for punitive-damages liability from evidence of intentional retaliation. However, the inference satisfying the punitive-damages standard will not arise in every instance. And, even where such scienter is present, the jury is not required to award punitive damages.

### 2.    Application

We hold that the district court properly denied Burlington Northern's Rule 50(b) motion. Again, drawing all inferences in favor of Mr. Hysten, a reasonable jury could have found by clear and convincing evidence that Burlington Northern acted willfully and maliciously in discharging Mr. Hysten.

As outlined *supra*, from Mr. Hysten's circumstantial evidence, a reasonable jury could find that Burlington Northern made the intentional decision to fire Mr. Hysten at least in part because of the possibility that it would incur FELA liability due to his on-duty injury claim. Furthermore, such a jury could infer from the inconsistencies in Burlington Northern's explanations that Burlington Northern knew that (1) what it was doing was wrongful; and (2) its actions would be harmful, given that its actions would invariably cause Mr. Hysten to lose his job

for no work-related reason. *See Moyer*, 885 P.2d at 396. Indeed, neither Mr. Johnson nor Mr. Hall suggested that, under then-extant Kansas law, Burlington Northern believed it lawfully could fire Mr. Hysten for preserving a FELA claim through an on-duty-injury report.

As Burlington Northern contends, Mr. Hysten failed to characterize Burlington Northern's conduct as malicious or willful in his closing argument. This fact, however, offers no help to Burlington Northern. A party's legal characterization of evidence during its closing argument in no way changes the quality of that evidence. More specifically, the absence of the labels "malicious" or "willful" in Mr. Hysten's description of Burlington Northern's conduct was not a tacit admission by Mr. Hysten that evidence was not present to support those labels. After all, cognizant of the punitive damages instruction already provided to the jury—which contained definitions of "malice" and "willful"—Mr. Hysten affirmatively argued in closing for the jury to return a punitive-damages verdict, emphasizing that such damages were necessary to punish Burlington Northern for wrongfully firing Mr. Hysten for exercising his FELA rights. Accordingly, we reject as unpersuasive Burlington Northern's punitive damages contentions based on Mr. Hysten's closing argument.

Because the evidence was sufficient to support an award of punitive damages, we reject Burlington Northern's challenge to the district court's denial of its Rule 50(b) motion.

-41-

## C. Prejudgment Interest

Finally, the district court granted Mr. Hysten's post-trial motion to amend the judgment pursuant to Rule 59(e), awarding $9,265.09 in prejudgment interest. Although presumably agreeing with Mr. Hysten's logic, the district court did not clearly articulate its reasoning.

Burlington Northern argues that the district court abused its discretion, under KAN. STAT. ANN. § 16-201 (2005), by awarding Mr. Hysten prejudgment interest on his $30,000 award of back pay. Burlington Northern reasons that the backpay claim did not become liquidated until the date of the jury verdict. We reject Burlington Northern's argument, and affirm the district court's award.

### 1. Standard

This Court reviews an award of prejudgment interest under Kansas law for an abuse of discretion. *See Hofer v. Unum Life Ins. Co. of Am.*, 441 F.3d 872, 879 (10th Cir. 2006). Generally, "prejudgment interest is allowable pursuant to K.S.A. § 16-201 unless the claim for damages is unliquidated." *In re McReynolds*, 44 P.3d 391, 398 (Kan. 2002). This deviates from the more lenient approach to awarding prejudgment interest on federal claims. *See, e.g.*, *FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1388 (10th Cir. 1998) ("prejudgment interest normally should be awarded on successful federal claims"); *Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 216 F. Supp. 2d 1240, 1246 n.6 (D. Kan. 2002) (noting difference between Kansas and federal common law standard for

prejudgment interest).[12]

Under Kansas law, a claim is liquidated "when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation." *Kan. Baptist Convention v. Mesa Operating Ltd. P'ship*, 898 P.2d 1131, 1144 (Kan. 1995) (internal quotation marks omitted) (quoting *In re Midland Indus., Inc.*, 703 P.2d 840, 842 (Kan. 1985)). In assessing the propriety of a prejudgment interest award, the court must determine (1) whether the amount claimed is fixed, certain, and ascertainable; and (2) if so, when this amount became so. *See Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d 670, 674 (10th Cir. 1990). In conducting this analysis, "[i]t is irrelevant that the underlying liability is disputed, so long as the amount of damages is certain." *Green Constr. Co. v. Kan. Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir. 1993).

## 2. Application

Though we believe that the district court should have articulated more fully its reasoning supporting its award of prejudgment interest, we nonetheless affirm the award because we are not left with "a definite conviction that the court clearly erred in its judgment." *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 (10th Cir.

---

[12]     In Title VII actions, "prejudgment interest is an element of complete compensation in back pay awards." *Reed v. Mineta*, 438 F.3d 1063, 1066 (10th Cir. 2006) (internal quotation marks omitted) (quoting *Loeffler v. Frank*, 486 U.S. 549, 558 (1988)).

2003).

At the outset, we reject Burlington Northern's suggestion that a dispute as to liability on the underlying substantive claim prevents the amount of damages from becoming liquidated.  This is incorrect as a matter of Kansas law.  *See Hutton Contracting Co., Inc. v. City of Coffeyville*, 487 F.3d 772, 786 (10th Cir. 2007) (good faith dispute as to liability does not preclude grant of prejudgment interest); *Green Constr. Co.*, 1 F.3d at 1010 (reviewing denial of prejudgment interest on breach of contract claim and noting that "[i]t is irrelevant that the underlying liability is disputed, so long as the amount of damages is certain"); *Royal Coll. Shop, Inc.*, 895 F.2d at 674 (same).

Burlington Northern has not demonstrated that it challenged, at trial, the amount of the backpay claim or the period of accrual.  Burlington Northern fails to cite evidence in the record that it disputed Mr. Hysten's evidence of the date of his wrongful discharge and eventual reinstatement.  Nor does Burlington Northern cite evidence in the record where it disputed, as a question legally distinct from the issue of liability, the amount of backpay.  *See Hutton Contracting Co., Inc.*, 487 F.3d at 786 (breach of contract award not liquidated "because the amount itself, not just the liability of that amount, was subject to dispute").  *Cf. Royal Coll. Shop, Inc.*, 895 F.2d at 675 (reversing denial of prejudgment interest on award for breach of contract claims under Kansas law when issue of damages was not contested).  With no evidence that Burlington Northern contested the two

-44-

relevant factors at trial, we cannot say that the district court's award was clearly erroneous.

We recognize that Mr. Hysten sought $64,588.40 in back pay, but the jury awarded only $30,000. This suggests some uncertainty as to how long Mr. Hysten was owed backpay, or how much he was owed, or both. However, this uncertainty does not mean that the entirety of the requested backpay award was unliquidated. Indeed, Burlington Northern offers no explanation as to why Mr. Hysten's backpay injuries—of *at least* $30,000—were not readily ascertainable starting at the time of Mr. Hysten's termination, on July 12, 1999, and incrementally continuing through the date of his reinstatement, on April 3, 2001. We defer to the district court's discretionary finding that the amount of the backpay award was precise and ascertainable from the date of discharge. *See Hofer*, 441 F.3d at 880 (deferring to district court's determination as to when amount becomes fixed and certain under Kansas's prejudgment-interest standard).

According to our reading of the record as guided by the parties, Burlington Northern only disputed its liability at trial, but did not contest either the dates of Mr. Hysten's discharge and reinstatement or his evidence regarding the amount of backpay to which he was entitled. Accordingly, we cannot say as a matter of Kansas law that the district court abused its discretion in awarding prejudgment interest.

### III. CONCLUSION

For the preceding reasons, we **AFFIRM** the district court's denial of Burlington Northern's Rule 50(b) motion as to the retaliatory discharge claim and the court's award of punitive damages.  We also **AFFIRM** the district court's decision to award prejudgment interest.