FILED
United States Court of Appeals
Tenth Circuit

March 16, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LARRY D. HYSTEN,

      Plaintiff-Appellant,

v.

BURLINGTON NORTHERN SANTA
FE RAILWAY COMPANY,

      Defendant-Appellee.

No. 09-3333
(D.C. No. 2:08-CV-02179-EFM)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **BALDOCK**, and **HOLMES**, Circuit Judges.

Plaintiff-Appellant Larry D. Hysten appeals from the district court's order

granting summary judgment in favor of Defendant-Appellee Burlington Northern

Santa Fe Railway Company ("BNSF"). Mr. Hysten argues that he has presented

circumstantial evidence from which a reasonable jury could conclude that BNSF

wrongfully discharged him in retaliation for exercising his rights under the

Federal Employer Liability Act ("FELA"), 45 U.S.C. §§ 51–60, and because of

his race. We affirm the district court's order for the reasons set forth below.

---

     [*]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

# BACKGROUND[1]

Mr. Hysten, an African-American, was first employed by BNSF's predecessor in 1977. Mr. Hysten worked for BNSF as a freight car mechanic and carman for almost thirty years, and was a member of the Brotherhood Railway Carmen Division of the Transportation Communications International Union for the duration of his employment.

In 1999, Mr. Hysten sustained a back injury while working at BNSF's facility in Topeka, Kansas, which caused him to miss three days of work. At first, Mr. Hysten told his supervisor, Monte Johnson, that he did not know the cause of his injury. Mr. Johnson, however, insisted that the company needed to know the origin of the injury, and Mr. Hysten eventually filled out an "Employee Personal Injury/Occupational Illness Report," which identified his injury as "work-related." Aplt. App. at 144–45 (Decl. of Larry D. Hysten, dated May 19, 2009). Shortly thereafter, BNSF conducted a disciplinary investigation into whether Mr. Hysten had violated certain BNSF safety rules regarding personal injuries. An investigative hearing was held, and Mr. Hysten was dismissed from his employment on July 12, 1999.

After his dismissal, Mr. Hysten filed a grievance pursuant to the collective

---

[1] As Mr. Hysten is challenging the district court's grant of summary judgment, the facts in this section are presented "in the light most favorable to [him]." *United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1136 (10th Cir. 2010).

bargaining agreement between BNSF and his union and, following an arbitration hearing, was reinstated to his position in April 2001. Mr. Hysten then sued BNSF in Kansas state court on May 25, 2001, alleging that he had been wrongfully discharged under Kansas common law for exercising his FELA rights. The action was removed to federal district court, where the court dismissed the lawsuit for failure to state a claim, concluding that Kansas would not recognize the tort of retaliatory discharge based upon an employee's exercise of his FELA rights. *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 196 F. Supp. 2d 1162, 1169–70 (D. Kan. 2002), *rev'd*, 98 F. App'x 764 (10th Cir. 2004). Mr. Hysten appealed the district court's dismissal of his claim.

On appeal, we certified two questions of law to the Kansas Supreme Court: (1) whether Kansas law recognizes an action in tort based on an employer's discharge of an employee in retaliation for the employee's exercise of rights under FELA; and, if so, (2) whether the remedies available to an aggrieved employee under the Railway Labor Act ("RLA") are adequate alternative remedies such that this tort action is precluded. *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 85 P.3d 1183 (Kan.), *modified and superseded by*, 108 P.3d 437 (Kan. 2004). The Kansas Supreme Court answered our first question in the affirmative and also concluded that the RLA failed to provide adequate alternative remedies. *Id.* Consequently, we reversed the district court's dismissal and remanded Mr. Hysten's case for further proceedings. *See Hysten*, 98 F. App'x

-3-

764. On remand, the case proceeded to trial, and the jury entered a verdict in favor of Mr. Hysten. BNSF appealed, and we upheld the jury's verdict. *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260 (10th Cir. 2008).

In April 2002, Mr. Hysten and the other Topeka freight car mechanics were transferred to BNSF's Havelock facility in Lincoln, Nebraska. On March 22, 2006, Mr. Hysten argued with another carman, Dennis Latham, about some misplaced tools. Mr. Hysten admits that he yelled and cussed at Mr. Latham, and that he called him lazy. According to fellow co-worker Dennis Bliss, when Mr. Latham left the area, Mr. Hysten said that he "ou[gh]t to follow [Mr. Latham] outside and crack him." Aplee. App. at 239 (Def.'s Ex. 26, Puhl Report, filed Apr. 29, 2009). The incident was reported to BNSF General Foreman James Puhl, who met with Mr. Hysten and union representative Bill Connour later that morning. At the meeting, Mr. Hysten agreed that he may have acted improperly toward Mr. Latham, admitted that he might have an anger problem, and indicated that he would attempt to control his temper.

That same day, Mr. Hysten called another co-worker, Gary Roberts, a "cock sucker." Aplt. App. at 157 (Dep. of Larry D. Hysten, dated Dec. 18, 2008). Mr. Roberts immediately reported the statement to Mr. Puhl. Not long thereafter, Mr. Puhl received a report from Mr. Bliss concerning Mr. Hysten's inappropriate behavior outside of the workplace. Mr. Bliss reported that Mr. Hysten told him that he had beaten his girlfriend, sending her to the emergency room, and stated

-4-

that "what [he] need[ed] to do [was] cap the [bitch]."  Aplee. App. at 238.  Mr. Bliss also reported that Mr. Hysten had told him that he had a record in Topeka "for shooting a gun at someone," and Mr. Bliss expressed concern that Mr. Hysten "may be a hazard" and "needed to see a professional."  *Id.*  Mr. Bliss indicated that he thought that this information was confidential because Mr. Hysten may have confided in him in his capacity as a member of Operation Stop, a peer counseling program designed to address alcohol and substance abuse among BNSF employees.

On the basis of the information supplied by Mr. Roberts and Mr. Bliss, Mr. Puhl decided to formally investigate Mr. Hysten's conduct.  Mr. Puhl notified Mr. Hysten on March 23, 2006, that Mr. Hysten was to attend an investigative hearing on March 29, 2006, to develop the facts and circumstances surrounding his alleged violation of BNSF Safety Rules S-28.6 and S-28.6.1, which provide, respectively, that "[e]mployees must not be . . . [q]uarrelsome . . . or . . . [d]iscourteous," and "must refrain from using boisterous, profane, sexist, or vulgar language."  *Id.* at 228–29 (Mech. Safety Rules & Policies, dated Oct. 30, 2005).  Mr. Hysten's union representative requested that the investigation be postponed until April 3, 2006, and Mr. Puhl agreed.  After consulting with the outgoing lead general foreman, Mr. Puhl decided to withhold Mr. Hysten from service pending resolution of the investigation.

On March 27, 2006, Mr. Hysten requested a waiver of the investigation

pursuant to Rule 35 of the collective bargaining agreement, which allows an employee to receive a lesser disciplinary sanction in lieu of an investigative proceeding that could lead to dismissal. The following day, Mr. Puhl sent an e-mail to Dane Freshour, director of human resources, and Jason Ringstad, director of employee performance, seeking their advice regarding Mr. Hysten's waiver request. Mr. Puhl attached a copy of his investigation report to the e-mail. Mr. Freshour then sent an e-mail to Steven Klug, assistant vice president of human resources-operations, stating that he had discussed the case with Mr. Ringstad and thought that the circumstances called for Mr. Hysten's dismissal. He attached a copy of Mr. Puhl's report. Mr. Freshour's e-mail also noted that Larry Stroik, a senior general attorney for BNSF who had monitored BNSF's appeal of Mr. Hysten's earlier FELA-retaliation lawsuit, had been "involved in the situation when he was in Topeka." Aplt. App. at 183. Mr. Ringstad responded shortly thereafter, suggesting dismissal in light of Mr. Hysten's "prior violence[-]related incidents on and off property." *Id.* at 182. Mr. Ringstad's e-mail was also sent to Mark Davison, the new general foreman III at the Havelock facility.

Mr. Freshour then sent an e-mail to Rebecca Stanosheck, manager of human resources at BNSF's Topeka facility, on March 28, 2006, asking her to summarize Mr. Hysten's disciplinary record in Topeka. Ms. Stanoschek responded in an e-mail to Mr. Freshour on March 30, 2006, in which she noted that Mr. Hysten had been the subject of a "formal investigation over an injury that

resulted in his dismissal," that he had filed "at least one lawsuit against [BNSF]," and that he had "a history of conflict with coworkers and management," although none of the reported conflicts had occurred after 1999. *Id.* at 187. Mr. Freshour forwarded this e-mail to Mr. Puhl, Mr. Klug, and Mr. Ringstad. That same day, Mr. Puhl sent Mr. Hysten a letter informing him that his request for a waiver of the investigative hearing had been denied.

On April 3, 2006, BNSF conducted the investigative hearing as planned. Notwithstanding his earlier admission on March 22 that he might have acted improperly toward Mr. Latham, Mr. Hysten testified that he had never threatened anyone on the job. Mr. Bliss, however, reiterated his previous assertion that Mr. Hysten had threatened to "crack" Mr. Latham, *id.* at 92 (Investigative Hr'g Tr., dated Apr. 3, 2006), and testified that Mr. Hysten became "threatening . . . when he los[t] his anger" and seemed out of control, *id.* at 93. Mr. Latham explained that he had not "really [felt] threatened" by Mr. Hysten's conduct, but stated that Mr. Hysten was known to "blow[] up. If he's got something in his hand, he'll throw it. If there's anything around to kick, he's going to kick it." *Id.* at 90. Mr. Hysten's request for a waiver of the investigation and Mr. Puhl's denial of that request were also read into the investigative hearing record.

Mr. Davison did not attend the investigative proceedings; however, as the most senior manager at the Havelock facility, he was tasked with rendering the disciplinary decision. After reviewing the investigation transcript, Mr. Davison

sent Mr. Ringstad an e-mail asking for his disciplinary recommendation, in light of the hearing transcript and Mr. Hysten's employee record. On April 21, 2006, Mr. Ringstad sent an e-mail to Mr. Freshour and Mr. Klug informing them that he and Mr. Davison agreed that termination was the best course of action. "The dismissal is not necessarily a sure win in arbitration," the e-mail read, "but we'll have a good chance." *Id.* at 184 (Davison E-mail, dated Apr. 21, 2006). Mr. Ringstad's e-mail reiterated that Mr. Hysten "had conduct issues outside the workplace," but noted that "they were not discussed during the investigation." *Id.* That same day, after receiving approval from Warren Cross, BNSF's chief mechanical officer, Mr. Davison sent Mr. Hysten a dismissal letter, which stated that "[i]n assessing discipline, consideration was given to your personal record." *Id*. at 96 (Dismissal Letter, dated Apr. 21, 2006).

Mr. Hysten sued BNSF on April 18, 2008, claiming that he was wrongfully discharged under Kansas common law in retaliation for exercising his rights under FELA; that he was wrongfully discharged because of his race, in violation of 42 U.S.C. § 1981; and that he received disparate treatment because of his race, also in violation of 42 U.S.C. § 1981. BNSF then filed a motion for summary judgment, which the district court granted on October 8, 2009. This appeal followed.

## DISCUSSION

On appeal, Mr. Hysten challenges the district court's order granting summary judgment in BNSF's favor, arguing that (1) he was wrongfully discharged under Kansas common law in retaliation for exercising his rights under FELA; and (2) he was wrongfully discharged because of his race, in violation of 42 U.S.C. § 1981.[2] Having carefully reviewed both claims, we affirm the district court's decision in full.

## I.      Standard of Review

"We review the district court's grant of summary judgment de novo, using the same legal standard applied by the district court." *Apartment Inv. & Mgmt. Co. v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1192 (10th Cir. 2010). Under that standard, summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] When applying this standard, "[w]e examine the factual record and draw all reasonable inferences in the light most favorable to the non-moving

---

[2]      Mr. Hysten has abandoned his claim of disparate treatment under 42 U.S.C. § 1981 on appeal.

[3]      The federal rules were recently amended, with changes effective December 1, 2010. Pursuant to these amendments, the summary judgment standard previously enumerated as subsection (c) of Rule 56 was moved to subsection (a), and one word was changed from the previous version: genuine "issue" became genuine "dispute." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments). However, the "standard for granting summary judgment remains unchanged." *Id.*

party."  *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

## II.    Wrongful Discharge in Retaliation for Exercising FELA Rights

Kansas's employment-at-will doctrine generally permits employers to terminate employees for good cause, no cause, or even wrong cause.  *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).  Kansas courts have departed from the harshness of the employment-at-will doctrine for select public policy purposes, and have recognized a "tort for retaliatory discharge based on an injured worker's exercise of his or her rights under FELA."  *Hysten*, 108 P.3d at 443–44.  This "FELA exception . . . applies when an employer terminates an employee who has reported an on-duty injury because of the possibility of FELA liability, even though a FELA lawsuit has yet to be filed."  *Hysten*, 530 F.3d at 1268.

"Because evidence of retaliatory intent is frequently circumstantial in nature, Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims."  *Id.* (citations omitted); *see also Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002) (citing *Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n*, 35 P.3d 892, 898 (Kan. 2001)).

> Under this framework, the plaintiff establishes a prima facie case [of retaliation] by showing that: (1) he filed a claim under FELA, or sustained an injury for which he might assert a future FELA claim; (2) the employer had knowledge of the plaintiff's FELA claim or of the fact that he sustained a work-related injury for

which he might file a FELA claim; (3) the employer terminated the plaintiff's employment; and (4) a causal connection exists between the protected activity or injury and the termination.

*Hysten*, 530 F.3d at 1268.[4]

Once a plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the termination. *See Foster*, 293 F.3d at 1193. If the employer articulates such a reason, the presumption of discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). At that point, the plaintiff faces the full burden of showing that the employer acted illegitimately, which he may satisfy by demonstrating by a preponderance of the evidence that the employer's proffered reason is pretextual. *Id.*; *see Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005).

The district court found Mr. Hysten's claim to be fatally flawed because: (1) he failed to establish a prima facie case of retaliation; and (2) he did not offer evidence demonstrating that BNSF's proffered reason for termination was

---

[4] Mr. Hysten claims that he must merely demonstrate that BNSF decision-makers "were aware or *should have been aware*" of his prior FELA-related claim in order to meet his burden of proof. Aplt. Opening Br. at 23. It is true that the "knew or should have known" standard applies under Kansas common law, and "charges an employer with knowledge of those *facts* concerning an employee's workplace injury reasonably available to the employer at the time." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1121–22 (10th Cir. 2001); *accord Foster v. Allied Signal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002). Thus, insofar as Mr. Hysten suggests that he need only offer evidence that BNSF decision-makers should have known that he previously exercised his rights under FELA to prove his *state law* claim, he is correct.

pretextual. We may uphold a district court's judgment on any ground for which there is a record to permit conclusions of law. *See, e.g.*, *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994). We conclude that Mr. Hysten has failed to establish a triable dispute of material fact with respect to whether BNSF's proffered legitimate, non-retaliatory reason for his termination was pretextual. We limit our analysis to the pretext ground of the district court's judgment, because it is a sufficient and appropriate basis upon which to rest our decision.

Mr. Hysten does not dispute that BNSF has offered a legitimate, non-retaliatory reason for his termination: specifically, his alleged threats of violence in the workplace. The burden, as a result, rests with Mr. Hysten to offer evidence showing that this explanation was "mere pretext." *See, e.g.*, *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009). "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (alterations in original) (internal quotation marks omitted) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). "In determining whether the proffered reason for a decision was pretextual, 'we examine the facts as they appear to the person making the decision.'" *Watts v.*

*City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001) (quoting *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001)). "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).

Mr. Hysten argues that six pieces of circumstantial evidence demonstrate that BNSF's proffered reason for dismissal—that is, Mr. Hysten's threatening conduct—was pretextual: (1) the dismissal letter's statement that "consideration was given to [Mr. Hysten's] personal record"; (2) the allegedly false explanation that BNSF gave for Mr. Hysten's termination; (3) evidence that BNSF allegedly acted contrary to its written rules and policies in dismissing Mr. Hysten; (4) evidence that Mr. Hysten was allegedly treated differently from similarly situated employees; (5) the allegedly inconsistent and contradictory reasons that BNSF has given for Mr. Hysten's dismissal; and (6) "disturbing procedural irregularities" that allegedly occurred in the course of the investigation and at the investigative hearing. Aplt. Opening Br. at 25–31. We consider each in turn.

## A. Language in the Dismissal Letter

Mr. Hysten first argues that language in the dismissal letter—specifically, the statement that "[i]n assessing discipline, consideration was given to your personal record"—could lead a reasonable jury to conclude that BNSF's purported reason for dismissing Mr. Hysten was pretextual. *Id.* at 25 (quoting

Aplt. App. at 96). More particularly, Mr. Hysten argues that the dismissal letter clearly indicates that BNSF's decision to terminate his employment was influenced by his prior FELA-protected activity, as "[t]he *only* significant disciplinary action listed in Mr. Hysten's personal record is his dismissal on July 12, 1999 for 'violation of rules . . . in connection with [personal injury] March [sic] 1999.'" *Id.* (ellipses and fourth alteration in original) (quoting Aplt. App. at 102 (Emp. Tr., dated Apr. 5, 2006)).

Even assuming that Mr. Davison was aware that Mr. Hysten was previously dismissed in connection with a personal injury, the statement in the dismissal letter is insufficient to establish that Mr. Hysten's violent threat was merely a pretextual ground for his dismissal. Although Mr. Hysten's personal record includes the 1999 dismissal that precipitated his FELA claim, it also includes 120 total demerits, which Mr. Hysten received while employed by BNSF. Aplt. App. at 102. There is no evidence in the record that the dismissal letter's general statement regarding Mr. Hysten's "personal record" somehow refers to the 1999 injury-related dismissal, as opposed to the numerous other infractions for which Mr. Hysten was disciplined. As such, Mr. Hysten offers nothing more than mere conjecture that the reference to his "personal record" was meant to refer to the 1999 dismissal that led to his FELA-related claim.

Moreover, as the district court correctly noted, "it simply is an unreasonable inference that Davison, who had nothing to do with the events that

occurred in 1999 at a different location, retaliated against [Mr. Hysten] in 2006 due to this 1999 injury and dismissal." *Id.* at 268 (Dist. Ct. Mem. & Order, filed Oct. 8, 2009). This conclusion is consistent with our previous decisions, which have found that changes in personnel and the passage of time mitigate against an inference of retaliation. *See, e.g.*, *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1175–76 (10th Cir. 2006) ("[W]e do not infer pretext from [an employer's] different treatment of [an employee] where the alleged different treatment was inflicted by different supervisors . . . because any difference may be the result of [a] different supervisor's reactions."); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("Unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity . . . ."); *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 487–88 (10th Cir. 1991) ("The problems that arose after plaintiff's reinstatement in 1980 occurred under different supervisors and bore no apparent relationship to the charge of sex discrimination."). In the present case, Mr. Hysten's allegations are undermined by the seven years that elapsed between his FELA-related injury and his ultimate dismissal, as well as the managerial changes that occurred during this time period.

## B.    False Explanation for Termination

Next, Mr. Hysten claims that pretext can be inferred from the allegedly false explanation that BNSF offered for his termination—i.e., that Mr. Hysten

-15-

threatened Mr. Latham with violence when he stated that he ought to "crack him."

Aplee. App. at 239. Although it is true that "[i]n appropriate circumstances, the

trier of fact can reasonably infer from the falsity of the explanation that the

employer is dissembling to cover up a discriminatory purpose," *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000), Mr. Hysten offers no

evidence indicating that BNSF's explanation for his termination was given

disingenuously.

In determining whether a "false" explanation gives rise to an inference of

discrimination, we have previously noted that "[t]he relevant inquiry is not

whether [the employer's] proffered reasons were wise, fair *or correct*, but

whether [it] honestly believed those reasons and acted in good faith upon those

beliefs." *Rivera*, 365 F.3d at 924–25 (second and third alterations in original)

(emphasis added). Mr. Hysten's contention that he "truthfully denied that he

made the threatening statement attributed to him," Aplt. Opening Br. at 27,

therefore misses the point. It matters not whether Mr. Hysten *actually made* a

threatening statement—what matters is whether BNSF decision-makers *believed*

in good faith that he did. Mr. Hysten presents no evidence demonstrating that

either Mr. Davison or Mr. Cross (or, for that matter, Mr. Ringstad) did anything

other than read the transcript of the investigative hearing and honestly

conclude—as one reasonably might—that Mr. Hysten threatened another

employee with violence. Even assuming, *arguendo*, that Mr. Hysten *did not* make

-16-

these threats, a reasonable person *could have* read the transcripts and concluded that he did.  Federal courts will not "act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003)).  As Mr. Hysten presents no evidence that eliminates—or even limits—the possibility that BNSF's explanation was honestly given, his unsubstantiated allegation that this explanation was false cannot serve as evidence of pretext.

### C.    Conduct Contrary to Written Policy

A jury may also infer pretext from "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances."  *Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  Mr. Hysten argues that BNSF contravened its written policies by (1) reading his waiver request into the record at the investigative hearing in violation of Rule 35 of the collective bargaining agreement; and (2) terminating Mr. Hysten for behavior that does not fall among the "dismiss[i]ble rule violations" set forth in BNSF's Policy for Employee Performance Accountability.  Aplt. Opening Br. at 27.

There is no question that BNSF violated Rule 35(f) of the collective bargaining agreement,[5] which provides that an employee's waiver request "shall not be referred to nor cited by" either party in subsequent proceedings, when it read Mr. Hysten's request into the investigative hearing record. Aplt. App. at 147. However, "[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer

---

[5]     Rule 35 states, in pertinent part:

> (a)     An employee in service more than sixty (60) days will not be disciplined or dismissed until after a fair and impartial investigation has been held . . . .
>
> . . . .
>
> (f)     The investigation provided for herein may be waived by the employee in writing, in the presence of a duly authorized representative. If the designated Carrier Officer agrees to grant the request, the employee will be advised of the discipline to be assessed prior to being required to sign the request for waiver of formal investigation form.
> 1.     The investigation will not be waived unless the form is signed by the employee under investigation, his duly authorized representative, and the designated Carrier Officer.
> 2.     This procedure is entirely voluntary on the part of the employee under charge.
> 3.     If waiver is not granted, the request shall not be referred to  nor cited by either party during subsequent handling.

Aplt. App. at 147.

for its employment decision were pretextual." *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995). In substance, Rule 35(f) merely prescribes that reference shall not be made to an employee's waiver request in a subsequent investigative hearing; it says nothing about the procedural protocol for terminating employees. Mr. Hysten offers no evidence of any connection between BNSF's breach of Rule 35(f) at his investigative hearing and BNSF's decision to terminate his employment. *See Kendrick*, 220 F.3d at 1230 (noting that pretext may be shown "with evidence that the defendant acted contrary to a written company policy prescribing *the action to be taken* by the defendant under the circumstances" (emphasis added)); *cf. Mohammed v. Callaway*, 698 F.2d 395, 400–01 (10th Cir. 1983) (finding that an employer's departure from employment criteria listed in a job announcement so as to disadvantage a minority employee seeking promotion was evidence of pretext). Nor does Mr. Hysten attempt to explain how this procedural violation—which did not occur in the presence of the BNSF decision-makers—is probative of discriminatory intent. BNSF's failure to comply with Rule 35(f) therefore has no bearing upon whether its explanation for Mr. Hysten's dismissal was pretextual. *See Randle*, 69 F.3d at 454 (concluding that the employer's failure to follow its own internal procedures was not probative of discriminatory intent where the employer was "not offering its procedures as a *reason* for its ultimate decision to promote" another employee instead of the plaintiff).

BNSF's second allegedly impermissible action—terminating Mr. Hysten for a supposedly non-dismissible offense—did not contravene the company's written policy in the first place. Mr. Hysten acknowledges that BNSF's policy provides that an employee may be dismissed for "[c]ausing serious altercation[s]" and "[v]iolence in [the] workplace including possession of weapons," Aplt. Opening Br. at 28 (first and third alterations in original) (quoting Aplt. App. at 180 (Policy for Emp. Performance Accountability App. C)) (internal quotation marks omitted), but insists that the "violations set forth in Mr. Hysten's dismissal letter—his 'quarrelsome, discourteous, threatening conduct and inappropriate language'—are *not* included in the list of eleven dismiss[i]ble rule violations," *id.* (citation omitted) (quoting Aplt. App. at 96). Mr. Hysten appears to argue that his conduct is not covered by the workplace-violence rule because he merely *threatened* violence, as opposed to having actually *committed* a violent *act*. If so, he reads the rule much too narrowly.

BNSF's policy does not specifically identify only acts of violence as dismissible events. For example, it explicitly broadens the scope of the rule to incorporate "possession of weapons." Aplt. App. at 180. The BNSF policy does not define this phrase. However, even if we assume that possession of weapons increases to *some degree* the *risk* that an act of violence will occur, *compare United States v. Serna*, 435 F.3d 1046, 1047 (9th Cir. 2006) ("[W]e know that possessing an object designed to be lethal does not alone pose a 'serious potential

-20-

risk' of physical injury." (quoting U.S. Sentencing Guidelines Manual § 4B1.2(a))), *with United States v. Dillard*, 214 F.3d 88, 93 (2d Cir. 2000) ("We think it undeniable that possession of a gun gives rise to *some* risk that the gun may be used in an act of violence."), giving the language of the phrase its ordinary and customary meaning, the "possession of weapons" does not itself constitute an *act* of violence, *see The New Oxford English Dictionary* 1324 (2d ed. 2005) (defining "possession" as "*the state* of having, owning, or controlling something" (emphasis added)).

Consequently, the most reasonable reading of BNSF's workplace violence policy construes that policy as encompassing both violent acts and violence-related conduct. As such, Mr. Hysten's actions fell well within the scope of the anti-violence policy, and BNSF fully complied with that policy when it decided to terminate Mr. Hysten for threatening Mr. Latham with violence.

### D. Treatment of Similarly Situated Employees

A plaintiff may also establish that an employer's asserted reason for termination was pretextual by presenting "evidence that [the plaintiff] was treated differently from other similarly situated employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1230. In the present case, Mr. Hysten argues that he was the only Havelock facility employee who was actually disciplined for violating Safety Rules S-28.6 and S-28.6.1 from 2004 to the present, despite the fact that "angry threats made by employees in the Havelock

-21-

facility were not uncommon," and a physical altercation between other employees had gone undisciplined. Aplt. Opening Br. at 28. Mr. Hysten also asserts that another employee had reported an incident involving "yelling and cussing" to his supervisors, but that BNSF officials had failed to pursue an investigation or take disciplinary action. *Id.* at 29 (internal quotation marks omitted).

In this circuit, we consider individuals to be similarly situated "when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *EEOC v. PVNF, L.L.C.*, (10th Cir. 2007) (quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)); *see also Rivera*, 365 F.3d at 922 ("Comparison of one disciplinary action with another ordinarily is relevant only to show the bias of the person who decided upon the disciplinary action."); *Kendrick*, 220 F.3d at 1233 ("Different supervisors will inevitably react differently to employee insubordination."). In developing this standard, we have noted that differences in how different employees are treated "may be explained by the fact that discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different, or that the individualized circumstances surrounding the infractions offered some mitigation for the infractions less severely punished . . . ." *EEOC v. Flasher Co.*, 986 F.2d 1312, 1320 (10th Cir. 1992) (citations omitted). In some cases, there may be "no rational explanation for the

-22-

differential treatment" between employees "other than the inevitability that human relationships cannot be structured with mathematical precision, and even that explanation does not compel the conclusion that the defendant was acting with a secret, illegal discriminatory motive." *Id.*

In the present case, the dissimilarities between the allegedly comparable situations that Mr. Hysten offers and his own dismissal are too great to warrant an inference of discriminatory animus. First, regarding Mr. Hysten's generalized claim that angry threats by Havelock employees were not uncommon, he offers absolutely no evidence describing the nature of these threats, whether supervisors were aware of the threats, whether the employees who made these threats had the same supervisor as Mr. Hysten, or when these threats were made.

Second, unlike the present case, the unpunished physical altercation that Mr. Hysten cites was never actually reported to company supervisors. Mr. Puhl testified that he had only heard rumors about the incident, and indicated that he believed that it had occurred off of company property. Finally, while another BNSF employee did testify that he *felt* threatened by the yelling and cussing incident to which Mr. Hysten refers, the record contains no evidence that he was actually threatened, or that he was threatened with violence. Furthermore, this alleged threat was purportedly reported to a supervisor other than Mr. Puhl. This supervisor was not even employed at the Havelock facility at the time of the incident between Mr. Hysten and Mr. Latham. Moreover, this incident occurred

-23-

more than a year-and-a-half after Mr. Hysten threatened Mr. Latham.  Thus, Mr. Hysten has presented absolutely no evidence from which a reasonable jury could conclude that he was treated differently from similarly situated BNSF employees who made comparable threats of violence.

**E.    Inconsistencies and Contradictions in BNSF's Explanation for Mr. Hysten's Termination**

We have also recognized that pretext can be inferred from "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Muller v. Eby Realty Grp., LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).  Mr. Hysten argues that the explanation that BNSF gave for his termination in its interrogatory responses contradicts the explanation proffered in its dismissal letter, and that the testimony of BNSF decision-makers conflicts with language in the dismissal letter and BNSF's interrogatory responses.

Some of Mr. Hysten's allegations would appear to be superficially correct. First, BNSF explained in its interrogatory responses that Mr. Hysten was dismissed "for violating BNSF's anti-violence policy by threatening the use of violence,"  Aplt. App. at 199 (Def.'s Answer to Pl.'s First Set of Interrogs., dated Jan. 19, 2009), while the dismissal letter states that he was dismissed for violating BNSF Safety Rules S-28.6 and S-28.6.1, which proscribe "[q]uarrelsome . . .

or . . . [d]iscourteous" conduct and "boisterous, profane, sexist, or vulgar language," not threats of violence, Aplee. App. at 228–29. Second, BNSF's interrogatory responses indicate that Mr. Hysten was dismissed for committing a second offense, but the record contains no evidence that he had committed an act of violence prior to his altercation with Mr. Latham. Third, one BNSF decision-maker, Mr. Davison, testified that Mr. Hysten's personal record had not influenced his decision, yet the dismissal letter specifically references Mr. Hysten's personal record.

Minor inconsistencies, however, do not constitute evidence of pretext; rather, only those inconsistencies that allow "a reasonable factfinder [to] rationally find [the defendant's proffered reason] unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons" are probative of pretext. *Morgan*, 108 F.3d at 1323. Here, while BNSF's interrogatory responses and the testimony of one of its decision-makers may not have comported precisely with some of the language in the dismissal letter, BNSF's explanation for Mr. Hysten's dismissal has remained consistent. The dismissal letter notes that Mr. Hysten was terminated on account of his "*threatening conduct* and inappropriate language on March 22, 2006," Aplt. App. at 96 (emphasis added), and BNSF's interrogatory responses similarly explain that Mr. Hysten was dismissed for "threatening the use of violence," *id.* at 199. This explanation was reinforced by Mr. Davison, who testified that he interpreted

-25-

Safety Rules S-28.6 and S-28.6.1—which he believed that Mr. Hysten had violated—as proscribing "threatening behavior." Aplee App. at 16–17 (Dep. of Mark Davison, dated Feb. 25, 2009).

Mr. Hysten argues that Mr. Davison's testimony that he did not refer to the policy on workplace violence in assessing discipline against Mr. Hysten, Aplt. App. at 166, contradicts BNSF's statement in its interrogatory responses that Mr. Hysten was "dismissed for violating BNSF's anti-violence policy," *id.* at 199. However, regardless of whether Mr. Davison knew that Mr. Hysten had violated BNSF's anti-violence rules, his reason for dismissing Mr. Hysten—his threatening conduct—is the very same reason cited in BNSF's dismissal letter and in its interrogatory responses. To the extent that any minor inconsistencies arise, they are overshadowed by BNSF's repeated assertions that Mr. Hysten was terminated for threatening a co-worker with violence. As such, these inconsistencies would not cause a rational factfinder to discount the legitimacy of BNSF's non-retaliatory explanation for Mr. Hysten's dismissal.

### F. Disturbing Procedural Irregularity

Finally, Mr. Hysten offers BNSF's supposed "deviations from normal company procedure" as evidence of the company's allegedly pretextual motives. Aplt. Opening Br. at 30 (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003)) (internal quotation marks omitted). Mr. Hysten argues that BNSF's decision-makers "relied upon confidential information which

-26-

was improperly disclosed by Mr. Bliss"—i.e., Mr. Hysten's alleged problems with his girlfriend, *id.*, and also deprived him of a "fair and impartial investigation" by failing to afford him an opportunity to rebut Mr. Bliss's allegations at the investigative hearing, *id.* at 31 (internal quotation marks omitted).

"We have previously held that disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007). However, "[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (alteration omitted) (internal quotation marks omitted). First of all, it is not clear that Mr. Bliss's disclosure violated BNSF procedure. Mr. Hysten claims that he confided in Mr. Bliss in his capacity as an Operation Stop team member, and that the substance of that conversation must therefore remain confidential. As the district court correctly noted, however, Mr. Hysten himself testified that Operation Stop's confidentiality policy pertains only to statements regarding drug or alcohol abuse. The statements that Mr. Bliss relayed to Mr. Puhl made no reference to drugs or alcohol, nor is there any evidence in the record that Mr. Hysten suffered from a drug or alcohol problem. As such, it is highly unlikely that those statements were confidential, such that their disclosure

violated BNSF policy and would thereby lend support for Mr. Hysten's contention of pretext. *See Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 775 (10th Cir. 2008) (concluding that an employer's failure to document an employee's performance problem did not support the employee's pretext claim where company policy did not expressly require written documentation to support a disciplinary action); *Estate of Daramola v. Coastal Mart, Inc.*, 170 F. App'x 536, 545 (10th Cir. 2006) (refusing to credit plaintiff's argument that his employer's motivations were pretextual where he failed to establish that his employer actually deviated from company policy).

Moreover, "the standard for establishing pretext requires evidence of not just any procedural shortfall, but of a '*disturbing* procedural irregularity,'" *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (emphasis added) (quoting *Timmerman*, 483 F.3d at 1122), "often exemplified by an employer's 'falsifying or manipulating of relevant criteria,'" *id.* (quoting *Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005)). Even assuming, *arguendo*, that BNSF did violate company procedure in relying upon the "confidential" information that Mr. Bliss disclosed to Mr. Puhl, this falls far short of the "disturbing procedural irregularity" benchmark. For example, the record contains no evidence that BNSF decision-makers falsified reports of Mr. Hysten's misconduct or manipulated company rules, such that Mr. Hysten was improperly found guilty of misconduct. *Cf. Plotke*, 405 F.3d at 1104–05 (finding that an

-28-

employer's fabrication of a memorandum following an employee's dismissal raised a genuine dispute of material fact as to the employer's motivation for the dismissal); *see also Maughan v. Alaska Airlines, Inc.*, 281 F. App'x 803, 808 (10th Cir. 2008) (concluding that an employer's pretextual motivation could be inferred from a poor performance review that was added after the employee was terminated).

Mr. Hysten's contention that BNSF deviated from the collective bargaining agreement when it denied him the opportunity to rebut Mr. Bliss's allegations is equally unpersuasive. Even assuming, *arguendo*, that BNSF did violate the terms of the collective bargaining agreement, we have previously held that an employer's refusal to allow an employee to challenge the allegations against him does not amount to a disturbing procedural irregularity, even where that refusal is technically contrary to company procedure. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (concluding that an employer's failure to allow an employee to respond to a customer complaint over which she was dismissed did not "constitute[] a 'disturbing procedural irregularity' sufficient to prove pretext," even though the company's written policy proscribed terminating an employee without seeking the employee's response to a complaint).

Moreover, an employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer *believed* that a relevant company policy existed, and

-29-

chose to deviate from the policy in spite of that belief. *See Cooper*, 296 F. App'x at 696 (finding that the employer's failure to "seek out the employee's side of the story" was contrary to company policy, but did not amount to a "disturbing procedural irregularity" where the employee failed to present evidence that the employer *believed* that its policy required it to obtain the employee's side of the story); *Berry*, 490 F.3d at 1222 (stating that if the "decisionmakers did not believe a rigid policy existed," their mistake in failing to follow it does not show pretext). Mr. Hysten offers no evidence of any BNSF procedure that affords employees the opportunity to challenge the evidence against them, nor has he presented any evidence that BNSF *believed* that such a policy existed. As such, Mr. Hysten is unable to show pretext based upon BNSF's purported deviation from its alleged policy regarding these matters.

In sum, none of the six pieces of circumstantial evidence that Mr. Hysten presents raises a genuine dispute of material fact as to whether BNSF's explanation for Mr. Hysten's termination—that he threatened a co-worker with violence—was merely pretext for a retaliatory dismissal. Even viewed in the aggregate, this evidence provides no basis for us to call into question the legitimacy of BNSF's motives. We therefore conclude that Mr. Hysten has failed to establish that BNSF's legitimate, non-retaliatory reason for terminating him was merely pretextual, and affirm the district court's grant of summary judgment in BNSF's favor on this basis. *See Sandoval*, 29 F.3d at 542 n.6 (10th Cir. 1994).

-30-

**III.    Wrongful Discharge Because of Race**

Mr. Hysten also argues that he was wrongfully dismissed from his position at BNSF on account of his race (i.e., African-American), in violation of 42 U.S.C. § 1981.  As we have previously observed, Section 1981—which guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens"—undisputedly applies to the employment-at-will relationship, and supports an employee's wrongful discharge claim.  42 U.S.C. § 1981 (1991); *see Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir. 1999).  In asserting such a claim, an employee may proceed under either a "mixed-motives" theory, under which the employee must demonstrate that the employment decision "was the product of a mixture of legitimate and illegitimate motives," or a "pretext" theory, under which the essential inquiry is whether "the employer's stated reason for its decision is pretextual."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 & n.12, 247 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107(a), 105 Stat. 1074.[6]  Mr. Hysten seeks to recover under a "mixed-motives" theory.

---

[6]    Although Mr. Hysten brings this claim under § 1981, and *Price Waterhouse* was decided under Title VII, we have previously held that "in racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII."  *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).

In order to establish his mixed-motives case, a plaintiff must show that "an impermissible motive played a motivating part in an adverse employment decision." *Id.* at 250. To meet his burden, Mr. Hysten again offers six pieces of circumstantial evidence, five of which he also presented in support of his FELA wrongful discharge claim. For the reasons discussed above, those five pieces of evidence fail to demonstrate that BNSF's decision was impermissibly motivated. *See supra* Part II(B)–(E); *Price Waterhouse*, 490 U.S. at 450. As a sixth and final piece of evidence, Mr. Hysten also offers the allegedly "racially derogatory comments" that Mr. Latham and Mr. Bliss purportedly made to him while he was employed at BNSF. Aplt. Opening Br. at 35. This evidence is equally unpersuasive.

Mr. Hysten points to two particular comments as evidence of BNSF's racial bias: (1) Mr. Latham's statement that Mr. Hysten "was not supposed to talk to white people that way," Aplt. App. at 155; and (2) Mr. Bliss's remarks expressing amusement at negative statements or actions that others directed at African-Americans or other racial minorities, *see id.* at 159–60. In determining whether these comments constitute evidence of discriminatory animus, we are guided by the principle that evidence of discrimination in the decision-making process must be distinguished from "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir.

-32-

2000) (quoting *Fast v. S. Union Co.*, 149 F.3d 885, 890 (8th Cir. 1998)) (internal

quotation marks omitted); *see Cuenca v. Univ. of Kan.*, 101 F. App'x 782, 788

(10th Cir. 2004) ("In general, statements by a non-decisionmaker . . . cannot be

used to establish that a decision was tainted by discriminatory animus."). By Mr.

Hysten's own admission, neither Mr. Latham nor Mr. Bliss are decision-makers;

thus, even if we were to credit this evidence of alleged racial bias, these

comments alone are insufficient to impute a discriminatory animus to BNSF.

Additionally, while we recognize the theory of the "cat's paw,"[7] under which an

employee can establish employer discrimination where certain biased

subordinates have directly affected the actions of an unbiased decision-maker,

---

[7] The Supreme Court has recently discussed the genesis of the theory. *See Staub v. Proctor Hosp.*, 562 U.S. __ (2011), 2011 WL 691244, at *3 n.1 (Mar. 1, 2011) ("The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [U.S. Circuit Judge Richard] Posner in 1990."). Although Mr. Hysten does not explicitly argue that BNSF decision-makers were liable pursuant to the "cat's paw" theory, he does cite *McCue v. State of Kan. Dep't of Human Res.*, 165 F.3d 784 (10th Cir. 1999), for the proposition that an employer cannot be "reward[ed] [for its] deceitfulness by insulating an organization from liability for retaliatory discharge where the decision-maker is kept ignorant of its subordinates' scheme." Aplt. Opening Br. at 35 (quoting *McCue*, 165 F.3d at 788). Though this proposition is correct, it does not help Mr. Hysten's case. There is no evidence in the record that Mr. Bliss or Mr. Latham in fact schemed to effect Mr. Hysten's dismissal. Nor are we under the mistaken impression that BNSF could insulate itself from liability by merely serving as the "cat's paw" for the biased motivations of its subordinates. *See, e.g.*, *Young*, 468 F.3d at 1253 (noting that discriminatory intent can be imputed to supervisors where the biased subordinate "uses the supervisors as a cat's paw to effect his or her own biased designs"). As such, Mr. Hysten's reliance upon *McCue* is misplaced.

-33-

Mr. Hysten offers no evidence that the actions of Mr. Bliss or Mr. Latham were a proximate cause of his termination. *See Staub*, 2011 WL 691244, at *6 ("[I]f a [subordinate] supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ."); *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 486–88 (10th Cir. 2006) ("[T]he issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions *caused* the adverse employment action." (emphasis added)); *see also Young*, 468 F.3d at 1253 ("In order to succeed under [the cat's paw] theory . . . a plaintiff must show that the allegedly biased [subordinate's] discriminatory reports, recommendation, or other actions were the *proximate cause* of the adverse employment action." (emphasis added)).

These two men were Mr. Hysten's co-workers; they had absolutely no supervisory authority or influence with respect to Mr. Hysten, including authority or influence relating to employee discipline. Furthermore, there is no indication in the record that the men intended for their actions to result in Mr. Hysten's dismissal.[8] Accordingly, we are confident that the actions of Mr. Bliss and Mr.

---

[8] In this regard, we note that Mr. Latham's testimony at the investigative hearing was hardly probative of Mr. Hysten's guilt; in fact, Mr. Latham stated that he did not "really feel threatened" by Mr. Hysten's conduct. Aplt. App. at 90. Presumably, had Mr. Latham actually sought Mr. Hysten's

(continued...)

-34-

Latham could not be deemed a proximate cause of Mr. Hysten's termination. *Cf. Staub*, 2011 WL 691244, at \*6 ("The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision."). In sum, we conclude that Mr. Hysten has failed to present sufficient evidence that BNSF's termination decision was impermissibly motivated by racial bias.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment in favor of BNSF.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

---

[8](...continued)
dismissal, he would have seized the opportunity to incriminate Mr. Hysten when he testified.